**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LEONARD LOGAN, | ) | |
| | ) | |
| *Plaintiff*, | ) | No. 24-cv-3897 |
| | ) | |
| *v.* | ) | Judge Franklin W. Valderrama |
| | ) | |
| the CITY OF CHICAGO, GLENN EVANS, | ) | Magistrate Judge Young B. Kim |
| ALEJANDRO ALMAZAN, EDWARD | ) | |
| O'BOYLE, LAWRENCE LYNCH, SYLVIA | ) | |
| VAN WITZENBURG, PAUL BERNATEK, | ) | |
| WILLIAM HALLORAN, HASAN AL- | ) | **JURY TRIAL DEMANDED** |
| AMIN, MICHAEL ROWAN, GERI LYNN | ) | |
| YANOW, SPECIAL REPRESENTATIVE OF | ) | |
| DECEASED DEFENDANTS PHILIP | ) | |
| GRAZIANO AND WILLIAM HIGGINS, | ) | |
| KENT SINSON, and COOK COUNTY, | ) | |
| ILLINOIS, | ) | |
| | ) | |
| *Defendants*. | | |

**FIRST AMENDED COMPLAINT**

Plaintiff Leonard Logan, by his attorneys, Loevy & Loevy, complains of Defendants the City of Chicago, Glenn Evans, Alejandro Almazan, Edward O'Boyle, Lawrence Lynch, Sylvia Van Witzenburg, Paul Bernatek, William Halloran, Hasan Al-Amin, Michael Rowan, Geri Lynn Yanow, Special Representative of Deceased Defendants Philip Graziano and William Higgins, Kent Sinson, and Cook County, Illinois, and states as follows:

**INTRODUCTION**

1.      Leonard Logan was wrongfully convicted of the 1997 murder of Timothy Jones, who was killed in a drive-by shooting on the South Side of Chicago. In 2000, Logan was sentenced to 45 years in prison. After spending nearly 23 years in prison for a crime he did not commit, he was exonerated in 2023.

1

2.       Logan had nothing to do with the shooting and has always maintained his innocence.

3.       Not one piece of physical evidence connected Logan to the Jones murder.

4.       The only evidence against Logan at his trial in 2000 was the testimony of Latonya Payton, who was subjected to three days of interrogation by police; was deprived of food, water, and sleep; and was coerced into giving fabricated evidence placing Logan at the scene.

5.       Unknown to Plaintiff, his counsel, or the prosecutors at the time, Defendants fabricated police reports claiming that Payton identified Logan.

6.       Defendants also harassed Logan's family, falsified information about him in police reports, and falsified details of his arrest.

7.       Defendants built an entirely false case against Logan by fabricating evidence, including the false inculpatory statement by Payton and police reports, and suppressing exculpatory evidence that Logan could have used to defend himself in the criminal trial against him. As a result of these fabrications and false statements, and the suppression of exculpatory evidence, Logan was convicted of murder.

8.       Never resting to fight for his innocence, Logan worked tirelessly for years to show that he had absolutely nothing to do with this crime.

9.       In 2023, after fighting for post-conviction relief, Logan's conviction was finally vacated. The prosecutors dismissed the case. Twenty-six years after this terrible ordeal began, Logan was finally exonerated.

10.       Logan now seeks justice for the harm that Defendants caused and redress for the loss of liberty and hardship that he endured and continues to suffer as a result of Defendants' actions.

## JURISDICTION AND VENUE

11.     This action is brought pursuant to 42 U.S.C. § 1983 to redress Defendants' deprivation of Plaintiff's rights secured by the U.S. Constitution.

12.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over his state-law claims pursuant to 28 U.S.C. § 1367.

13.     Venue is proper under 28 U.S.C. § 1391(b). Most or all of the Defendants reside in this judicial district, and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction.

## PARTIES

14.     Plaintiff Leonard Logan is a 51-year-old Black man from Chicago who spent 23 years in prison for a crime he did not commit.

15.     At all relevant times, Defendant Alejandro Almazan was a police detective in the Chicago Police Department ("CPD") acting under color of law and within the scope of his employment for the City of Chicago.

16.     At all relevant times, William Higgins was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago. Higgins is deceased. He is represented in this action by Geri Lynn Yanow, his Special Representative.

17.     At all relevant times, Defendant Edward O'Boyle was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

18.     At all relevant times, Philip Graziano was a police detective in the CPD acting under color of law and within the scope of his employment for the City of Chicago. Graziano is deceased. He is represented in this action by Geri Lynn Yanow, his Special Representative.

19.     At all relevant times, Defendant Lawrence Lynch was a police detective in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

20.     At all relevant times, Defendant Sylvia Van Witzenburg was a police detective employee in the CPD acting under color of law and within the scope of her employment for the City of Chicago.

21.     At all relevant times, Defendant Paul Bernatek was a police detective in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

22.     At all relevant times, Defendant William Halloran was a police detective in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

23.     At all relevant times, Defendant Glenn Evans was a Public Housing Officer and officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

24.     At all relevant times, Defendant Hasan Al-Amin was a police officer in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

25.     At all relevant times, Defendant Michael Rowan was a police detective in the CPD acting under color of law and within the scope of his employment for the City of Chicago.

26.     Defendants Almazan, Higgins, O'Boyle, Graziano, Lynch, Van Witzenburg, Bernatek, Halloran, Evans, Al-Amin, and Rowan are referred to collectively as "Defendant Officers."

27.     At all relevant times, Defendant Kent Sinson was an Assistant State's Attorney with the Felony Review Unit ("FRU") of the Cook County State's Attorney's Office ("CCSAO"). He is sued for actions he undertook, in conspiracy with Defendant Officers, as an investigator and

without probable cause to believe that Plaintiff had committed any crime. He acted under color of law and within the scope of his employment for the CCSAO.

28. Defendant City of Chicago ("the City") is a municipal corporation that is or was the employer of Defendant Officers. Defendant Officers acted during their investigation as agents or employees of the City. The City is liable based on *respondeat superior* for the tortious acts of Defendant Officers, committed in violation of state law. The City is additionally responsible for the policies and practices of the CPD.

29. Defendant Cook County ("the County") is a governmental entity within the State of Illinois, which provides funding for the CCSAO and was at all relevant times the employer of Defendant Sinson. The County is a necessary party to this lawsuit and is responsible for paying any judgment entered against Defendant Sinson.

30. Each individual Defendant is sued in his or her individual capacity.

## FACTS

### The Murder of Timothy Jones

31. On March 18, 1997, in the late evening, 23-year-old Timothy Jones was shot and killed at a gas station on the South Side of Chicago while talking on an outdoor pay phone.

32. Charles Jenkins was also at the pay phones at the time of the shooting. After seeing the perpetrator approach and shoot Jones, Jenkins ran toward an alley, where he was also shot.

33. L.C. Robinson was driving by the pay phones at the time of the shooting. He saw an SUV pull up to the station, saw a passenger get out of the car, shoot Jones, fire a few more shots at others in the vicinity, get back in the front passenger side of the car, and speed off.

34. Robinson followed the vehicle, wrote down the license plate number, and called 911. He did not describe the shooter on his 911 call.

35.     There were numerous discrepancies between eyewitnesses' physical descriptions of the suspect and Logan. Eyewitnesses described the shooter as shorter and of a lighter weight than Logan.

36.     Logan had absolutely nothing to do with this crime and is completely innocent.

**Payton's Coercive Interrogation and the Fabrication of Evidence**

37.     The next day, police officers used the license plate number retrieved from Robinson to track down an SUV that was rented to LaTonya Payton. Defendants Almazan, Higgins, and O'Boyle went to Payton's address.

38.     When questioned, Payton first insisted that the rental car was parked in front of her building since the previous night. This would be the first of at least eight different accounts of that night that Payton provided.

39.     Defendants Almazan, Higgins, and O'Boyle took Payton into custody.

40.     For a continuous three days, one or more of Defendant Officers, including Defendants Almazan, Higgins, Van Witzenburg, O'Boyle, Bernatek, and Halloran subjected Payton to repeated interrogation and polygraph examinations. They denied her food, water, sleep, and requests for counsel or a phone call while trying to force her to adopt their narrative of what happened. Payton's story continued to change each time she was interrogated.

41.     Humiliated, tired, scared, and hungry, Payton's will was overborne. One or more of Defendant Officers, including Defendants Almazan, Higgins, Van Witzenberg, O'Boyle, Bernatek, and Halloran, were able to coerce Payton into adopting their fabricated version of events, which falsely identified Logan as the shooter. These Defendants knew that their fabricated version of events was false.

42.     During her interrogation, one or more of Defendant Officers, including Defendants Almazan and Higgins, also suggestively showed Payton a single photo of Logan and fabricated her identification of Logan as the shooter.

43.     Once one or more of Defendant Officers, including Defendants Almazan, Higgins, Van Witzenberg, O'Boyle, Bernatek, and Halloran, were assured that Payton would tell their fabricated story, Defendant Van Witzenburg contacted the FRU.

44.     Defendant Sinson arrived from the FRU and continued interrogating Payton alongside Defendant Van Witzenburg. Defendants Van Witzenburg and Sinson knowingly coerced Payton into signing a fabricated statement inculpating Logan in the shooting. Defendants Van Witzenburg and Sinson knew that this statement was false.

45.     The statement that these Defendants fabricated for Payton falsely stated that Payton was in the car with two men, "Rodman" and "Dino." According to the statement, "Dino" was driving the car, got out of the car to shoot Jones at the gas station, and returned to the car to drive away from the scene.

46.     The statement used the nickname "Dino" for Logan, although Logan was never known by this nickname, and Payton did not tell these Defendants his nickname was "Dino."

47.     Defendants Almazan, Higgins, Van Witzenberg, O'Boyle, Bernatek, Halloran, and Sinson knew that Payton's implication of Logan was false and unreliable. They had pressured and coerced Payton into falsely implicating Logan in the shooting. Logan was a different weight and height from the described eyewitness accounts of the perpetrator. Despite these Defendants' efforts, Payton's handwritten statement also directly contradicted other eyewitness accounts that the shooter was the passenger, not the driver.

48. Defendants Almazan, Higgins, Van Witzenberg, O'Boyle, Bernatek, Halloran, and Sinson employed such tactics, knowing full well that they were likely to lead to a false identification, and would thus result in Logan's wrongful prosecution and conviction.

49. Defendants Halloran, Van Witzenberg, and Bernatek also fabricated a police report memorializing the falsified, coerced statement from Payton.

50. Defendants Almazan, Higgins, Van Witzenberg, O'Boyle, Bernatek, Halloran, and Sinson suppressed the fact that they fabricated evidence and manipulated Payton's story; they never disclosed this information to Plaintiff, his counsel, or the trial prosecutors.

**Defendants Heighten their Focus on Logan and Fabricate More Evidence**

51. One or more of Defendant Officers, including Defendants Van Witzenberg, Bernatek, and Halloran, fabricated additional evidence to credit their false and unsupported case against Logan.

52. Having decided to pin the crime on Logan, one or more of Defendant Officers, including Defendants Rowan, Graziano, and Lynch, involved Defendant Evans in the investigation.

53. Defendant Evans was a Public Housing Officer for Stateway Gardens, where Logan and his family lived. Evans had a history of harassing Logan and his family, including his mother.

54. That harassment had also turned violent. Several months before the Jones murder, Defendant Evans and his partner went in search of Logan. During the ensuing struggle, Evans shot Logan twice—once in the groin, and once in the arm—and falsely accused Logan of disarming him, causing Logan both to go to the hospital for his injuries and to be wrongfully charged with a crime. These false charges were ultimately dropped.

55.     Logan filed a complaint with the Office of Professional Standards ("OPS") and filed a lawsuit against Evans as a result of this incident, alleging that Evans used undue force, committed assault and battery against him, arrested him and placed him in custody without cause, and brought unfounded charges against him. Logan's allegations flatly contradicted the version of events offered by Evans.

56.     After the significant harassment and harm caused by Defendant Evans, Logan's mother was so concerned that Evans would harm Logan that she pleaded with him to leave town to avoid further harm. Similarly, Logan's defense attorney in his disarming case advised him to stay away from his normal address given Evans's actions.

57.     In retaliation for Logan's actions, Defendant Evans concocted further fabrications to inculpate Logan when he began to participate in this investigation. Defendant Evans and other Defendant Officers, including Rowan, Bernatek, Halloran, Graziano, and Lynch, interviewed family members of Logan and falsified police reports about the nature of Logan's relationship with family and friends.

58.     For instance, Defendants Rowan, Graziano, Lynch, and Evans included fabricated details in a police report of their interview of Lassandra Smith, the mother of Logan's children, including that he was having "domestic problems" with her and that he traveled "in any number of cars belonging to his friends"—both making Logan out to be a violent person and more likely to be using Payton's car.

59.     Additionally, Defendant Halloran falsified notes about his interview with Smith's mother to make it seem as if Logan were skipping town to evade arrest.

60.     Defendant Bernatek also falsely reported that Logan's mother conveniently had not seen him since the day after the murder.

9

61. In contradiction to these falsifications, Logan was not a violent person, and he had no reason to fear arrest for a crime he did not commit.

62. Armed with these fabrications, Defendants Almazan and Higgins attempted to have Jenkins, the only surviving shooting victim, identify Logan from a photo array. Defendants were unable to coerce Jenkins into identifying Logan as the shooter because Logan was not the shooter.

63. Defendants Bernatek and Halloran used suggestive tactics through an improperly conducted photo array to obtain a false positive identification of Logan as the shooter from another eyewitness, Elbert Garrett.

64. Defendant Officers never disclosed that any of this information was fabricated to the defense or prosecutors.

**Plaintiff's Arrest, Prosecution, and Wrongful Conviction**

65. Defendant Officers ensured that the fabricated evidence was presented to the grand jury.

66. Defendant Van Witzenburg brought Payton to the grand jury. She and other Defendant Officers threatened Payton by telling her that if she didn't repeat her story, she would be charged with first degree murder.

73. To concoct further false stories of Logan's supposed guilt, one or more of Defendant Officers, including Defendant Evans and Al-Amin, continued to falsify inculpatory information against Logan. They falsified the circumstances of his arrest to make it appear that Logan was evading arrest, in an effort to make him appear guilty. Their fabricated story of his arrest was used against Logan at his trial.

74. There was never any probable cause to suspect Logan of the murder of Timothy Jones.

75.     Apart from fabricated statements, a false identification, and false reports, Logan was never linked to the murder.

76.     Throughout the State's prosecution, Defendant Officers and Sinson withheld material exculpatory and impeachment evidence from the trial prosecution as well as Logan and his defense team, including the evidence of their own misconduct.

77.     Defendant Officers and Sinson did not disclose their fabrication of evidence to Logan, his counsel, or the prosecutors, in advance of or at the time of the criminal trial.

78.     Defendant Officers used false police reports to cover up their actions. They provided those false reports to prosecutors, and their fabricated evidence became the basis for charging and prosecuting Logan.

79.     Defendant Officers and Sinson also gave false statements to trial prosecutors.

80.     Logan's arrest and prosecution was based solely on the evidence fabricated by Defendant Officers and Sinson and thereafter suppressed by Defendant Officers.

81.     Absent Defendants' misconduct, Logan would never have been arrested, prosecuted, or convicted.

82.     Payton was the star witness for the prosecution at Logan's trial. She recanted on the stand. She testified that police coerced her into inculpating Logan by threatening that she would be charged with the murder, depriving her of food and sleep, and telling her what to say.

83.     Despite Payton telling the truth in court, the State was allowed to introduce Defendants' fabricated handwritten statement attributed to Payton, Payton's fabricated grand jury testimony, and other fabricated evidence to impeach her recanted testimony. Defendants' fabricated evidence was still used against Plaintiff in the criminal proceedings, and Defendants did not disclose information about the fabrication to Plaintiff, his counsel, or the prosecution.

84.     At trial, one of the shooting victims, Jenkins, testified that Logan was not the shooter. He stated that Logan was both taller and heavier than the shooter.

85.     The only evidence inculpating Logan at his trial was the evidence fabricated by Defendants—namely, Payton's false identification. Like the fabricated and suppressed police reports, Payton's fabricated identification was used to arrest, prosecute, and convict Logan of the murder. Defendant Officers never disclosed to the defense or trial prosecution that this identification was fabricated.

86.     In November 2000, Logan was convicted of first-degree murder.

87.     Defendant Evans testified at Logan's sentencing. Evans recounted his false version of the incident when he shot Logan in the stairwell of Stateway Gardens—the same event that led Logan to file a civil rights lawsuit against Evans for excessive force. Evans did not disclose that this story was false, permitting it to adversely impact Logan's sentencing.

88.     Logan was sentenced to 45 years in prison.

89.     The foreseeable consequence of the actions of Defendant Officers and Defendant Sinson was that Logan would be wrongfully convicted of the shooting. Indeed, the very purpose of Defendants' actions was to frame Logan, an innocent man, for a crime he did not commit.

90.     In addition, upon information and belief, Defendant Officers and Defendant Sinson suppressed and destroyed additional evidence still unknown to Logan, which would have been exculpatory, impeaching, or shown Plaintiff's innocence.

**Plaintiff's Exoneration**

91.     Logan has continued to maintain his innocence and pursue all legal avenues to prove it.

92.     Directly after being convicted, Logan filed a post-trial motion. Although his conviction was upheld on direct appeal, one judge issued a powerful dissent. Justice Tully noted that Payton's recanted testimony was the only evidence that suggested Logan was the perpetrator of the crime for which he was convicted, and there was no evidence corroborating her disavowed allegations. Justice Tully was also troubled by the fact that Payton's statement contradicted Robinson's eyewitness account that the shooter was the passenger, not the driver, of the SUV. Justice Tully concluded that this was "so unsatisfactory as to justify reasonable doubt of the defendant's guilt."

93.     Logan continued to challenge his conviction in post-conviction and habeas petitions.

94.     On July 17, 2023, the federal district court granted Logan's habeas petition, directed the Circuit Court of Cook County to vacate his conviction, and directed the State to announce whether it intended to retry Mr. Logan.

95.     On September 14, 2023, the State told the Court it would be unable to sustain its burden of proof, and the criminal charges against Logan were dismissed with prejudice.

### The City of Chicago's Policies, Practices, and Customs
### Caused Leonard Logan's Wrongful Conviction

96.     The City is responsible, by virtue of its policies, practices, and customs, for inflicting miscarriages of justice in scores of incidents like the one Logan endured.

97.     Since 1982, at least 150 cases have come to light in which Chicago police officers fabricated false evidence or suppressed exculpatory evidence to cause the convictions of an innocent person for serious crimes they did not commit.

98.     In these cases, CPD officers used the same or similar tactics Defendant Officers employed against Logan here, including abusing and coercing suspects or witnesses into falsely implicating themselves or others, fabricating evidence, and suppressing exculpatory evidence.

99.     At all relevant times, members of the CPD, including Defendant Officers, routinely manufactured evidence against innocent people by coercing, manipulating, threatening, pressuring, and offering inducements to suspects and witnesses to obtain false statements implicating innocent people, knowing full well those statements were false.

100.    As a matter of widespread custom and practice, members of the CPD, including Defendant Officers, contrived false narratives that were fed to vulnerable suspects and witnesses, who then adopted those false narratives as their own, enabling police to secure the wrongful convictions of innocent people.

101.    At all relevant times, members of the CPD, including Defendant Officers, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the police department and never disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the CCSAO and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

102.    Consistent with municipal policy and practice described in the preceding paragraph, employees of the City, including Defendant Officers, concealed exculpatory and impeaching evidence from Logan.

103.    The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established in the cases of *Rivera v. Guevara*, No. 12

14

CV 4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10 CV 1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87 CV 2536 (N.D. Ill.).

104.     The policies and practices of suppressing exculpatory and/or impeaching evidence at issue in *Rivera*, *Fields*, and *Jones,* applied throughout the 1980s through the 2000s, including at the time of the murder investigation in this case.

105.     The policy and practice of suppressing exculpatory and/or impeaching evidence was alive and well at all relevant times, including at the Area Two Detective Division during the investigation into the Jones murder.

106.     In addition, the City routinely used illegal tactics, including torture, physical coercion, and psychological coercion, to extract involuntary and false confessions and statements from suspects and witnesses. There are well over 250 documented cases of Chicago police officers using torture and coercion to illegally obtain confessions in homicide cases. The City had notice of this widespread practice of procuring false and coerced statements long before the events at issue in this case.

107.     In addition, the City routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

108.     Before and during the period in which Logan was falsely charged with and convicted of murder, the City also knowingly operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the City's disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

109.    As a result, Chicago police detectives and their supervisors were able to engage in rampant misconduct with impunity, and as a result caused scores of wrongful convictions just in Area Two, where Defendant Officers were assigned, and hundreds more City-wide.

110.    The City also failed in the years prior to Logan's conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

a.  The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses;

b.  The constitutional requirement to preserve and disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding;

c.  The conduct of live lineup, photographic, and other identification procedures;

d.  The risks of wrongful conviction and the steps police officers should take to minimize risks;

e.  The risks of engaging in tunnel vision during investigation; and

f.  The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

111.    The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Logan's wrongful conviction and his injuries.

112.    The City also failed to appropriately supervise its officers. The United States Department of Justice ("DOJ") issued a report finding that there were "engrained deficiencies in

the systems CPD uses to provide officers with supervision and training," and the deficiencies mirror those alleged here. In addition, the DOJ "confirmed that CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding officers accountable when they violate the law or CPD policy." In particular, the DOJ found that the City failed to investigate nearly half of misconduct complaints. Where investigations did occur, there were "consistent patterns of egregious investigative deficiencies," and where misconduct complaints were sustained, discipline was inconsistent and unpredictable.

113. Since before Logan's arrest and continuing for years afterward, municipal policymakers and department supervisors condoned and facilitated a code of silence within the CPD. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

114. Numerous municipal policymakers have even admitted the code of silence exists.

115. The City practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the CPD. As a result of these practices, members of the CPD act with impunity when they violate the constitutional and civil rights of citizens, knowing the City's lack of discipline and supervision and its code of silence will protect them.

116. Defendant Officers engaged in the misconduct described herein because they had no reason to fear that the City would ever discipline them for doing so.

117. Part and parcel with this history of fostering egregious misconduct, the CPD has a long history of using physically and psychologically coercive interrogation tactics in order to elicit

17

statements from witnesses and suspects in criminal cases, which has caused false confessions and led to wrongful convictions.

118.    This history goes back at minimum to the 1980s and continued well into the 2000s and includes the conduct of infamous Chicago police detectives, including Jon Burge, Michael McDermott, Kenneth Boudreau, Kriston Kato, Reynaldo Guevara, Defendant Halloran, and many others. In many cases, these and other Chicago police officers have been the subject of judicial determinations that they engaged in a pattern and practice of using physical and psychological abuse to coerce false confessions from suspects, and/or the exonerations resulted from DNA evidence proving the confessions were false, and/or the exonerations resulted in the State of Illinois certifying that the individual was innocent despite an earlier false confession.

119.    The wrongful conviction of innocent persons include numerous cases in which Chicago police detectives used the very same tactics that Defendant Officers employed against Plaintiff in this case. These tactics include: (a) psychological intimidation and manipulation of witnesses; (b) the suppression and concealment of exculpatory information, including fabricated information; and (c) the use of other unlawful tactics to secure the arrest, prosecution, and conviction of persons, without regard to their actual guilt.

120.    In 2019, the Federal Bureau of Investigation ("FBI") and DOJ confirmed that CPD supervisor Jon Burge was aware that on numerous occasions, detectives he was supervising participated in the psychological and physical abuse of persons being questioned.

121.    Furthermore, CPD officers systematically suppressed exculpatory and impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured, or offered inducements to make false statements.

18

122.    The practice of obtaining coerced and false statements from suspects and witnesses by CPD has had, for decades, a concomitant practice involving FRU assistant state's attorneys reporting to the police station to purportedly "memorialize" statements and "confessions" allegedly voluntarily made by the suspect.

123.    The process is designed to provide an air of legitimacy to the interrogation and "confession" but really is intended to make it harder for someone who has been coerced to bring the truth to light in court proceedings because they must overcome the lies of the police as well as the involvement (even if they are unaware of, or not part of, the coercion) of a prosecutor who will testify as a witness at trial (and who is not the CCSAO attorney who acts in a prosecutorial function at trial).

124.    The FRU assistant state's attorneys work alongside police officers, approving statements in case after case. As a consequence, the misconduct and coordination between Defendant Officers and Defendant Sinson during the investigation of the Jones murder was not unique or isolated. Instead, members of the FRU, as a matter of widespread custom and practice, routinely facilitate and cooperate in fabricating and coercing statements from suspects and witnesses in the custody of the CPD and then fail to disclose exculpatory evidence to attorneys in their own Trial Division.

125.    At all relevant times, the CCSAO typically staffed the FRU with new, young prosecutors. The FRU attorneys know that their time in the unit has the potential to "make or break" their careers, giving them an incentive to go along with the detectives, because performance in the FRU is a stepping stone to getting to the Trial Division of the CCSAO.

126.    The FRU attorneys are also implicitly taught, through pressure from CPD officers and their own supervisors, that they had to approve detectives' charges even if they did not believe

there was enough evidence, because standing in the way could be an impediment to getting into the Trial Division and because they would be punished by their supervisors for not being "team players." By the time young prosecutors get into the Trial Division, needing to secure convictions to get promoted, they have little opportunity or incentive to expose police misconduct, even when they see it, because doing so will make police officers unwilling to serve as witnesses in their cases because they are not "team players," and would potentially expose their own misconduct.

127.     In the end, the very structure of having FRU attorneys at a police station is a significant outlier in policing in the United States. It is designed to protect CPD misconduct and secure wrongful convictions on flimsy, coerced, or fabricated evidence.

128.     In the 1990s, obtaining convictions—regardless of the strength or legitimacy of the evidence—was such an overriding goal that prosecutors at the felony courthouse at 26th and California purportedly had an ongoing competition to be the first to convict defendants whose weight totaled 4,000 pounds. Men and women, upon conviction, were marched into the room and weighed on a bathroom scale. Behind closed doors, the contest was described as "N------ by the Pound," because most of the defendants were Black.

129.     The City's failure to train, supervise, and discipline its officers, including Defendant Officers, condones, ratifies, and sanctions the kind of misconduct that Defendants committed against Logan in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

130.     The City and final policymaking officials within the CPD failed to act to remedy the patterns of abuse described in the preceding paragraphs despite actual knowledge of the pattern

of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Logan's ongoing injuries.

131.    For example, Defendant Evans has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case. In addition to having civil suits lodged against him and governmental investigations probe into his behavior, Defendant Evans is also among a small number of CPD officers with an extraordinarily high number of citizen complaints. In fact, Evans has faced more complaints of police misconduct than 99.8% of other officers in the entire Chicago Police Department.

132.    Defendant Evans's misconduct includes:

a.    Around September 2014, Evans was arrested, indicted, and charged with aggravated battery and official misconduct stemming from a 2013 incident in which Evans forced his gun into an arrestee's mouth, put a Taser weapon to the arrestee's groin, and threatened to kill him.

b.    News coverage of this event publicly revealed for the first time Evans's significant history of excessive force complaints, including numerous complaints in the years surrounding Logan's case.

c.    In fact, the news coverage stated that Evans drew 36 complaints in eight years—far more complaints than anyone else of his rank and higher than all but 34 officers for the entire 12,000+ department.

d.    Logan was unaware of Evans's history of misconduct until the news coverage.

e.    Evans's name was listed on multiple internal police documents tracking those "with the worst records of complaints."

21

  f. Evans had been suspended from his duties at least ten separate times, with half of those stemming from excessive force complaints, including two times that resulted in separate 15-day suspensions.

  g. By the time that Evans arrested Logan in March 1997, he had already amassed 48 different complaints of misconduct.

  h. By the time that Logan was convicted in March 2002, Evans had earned another 25 complaints—five of which the Chicago Police Department categorized as either "Weapon, Use Of," "State Civil Suit," or "Illegal Arrest" – bringing his total at that time to 73.

  i. The full pattern and practice of Evans's misconduct was not disclosed to the public until 2014, when the Illinois Appellate Court decided *Kalven v. City of Chicago*, 2014 IL App. 1121846, and the City of Chicago decided to produce complaint register files rather than appeal. Logan learned via a FOIA request at that time the full extent of Evans's misconduct.

  j. As of the filing of this Complaint, 132 complaints have been filed against Defendant Evans.

133. Similarly, other Defendants have a long history of misconduct allegations. For instance, Defendant Lynch has at least 41 allegations; Defendant Graziano has at least 22 allegations; and Defendant Almazan has at least 17 allegations, making them outliers within the department.

134. The City and its final policymaking officials failed to act to remedy the patterns of abuse described in the preceding paragraphs despite actual knowledge of the pattern of

misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Logan's ongoing injuries.

135.     The policies and practices described in the foregoing paragraphs were also approved by final policymakers for the City, who were deliberately indifferent to the violation of constitutional rights described herein.

**Leonard Logan's Damages**

136.     For 23 years, Logan was forced to live in a cage and serve out a punishment for a crime he did not commit.

137.     Logan was required to live in conditions that were inhumane and damaging to his physical and mental health. A constant atmosphere of fear, distrust, threats, and violence from prisoners and correctional staff alike permeated the prison environment. For over two decades, Logan's life was marked by a steady stream of human rights abuses.

138.     During his wrongful incarceration, Logan was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, funerals, and other life events with loved ones, and was deprived of the fundamental freedom to live his life as an autonomous human being.

139.     Logan's 23 years of wrongful incarceration forced him into a world of isolation in which he lost contact with many of his friends and family in the outside world.

140.     He was deprived of meaningful opportunities for education and had to teach himself how to read and write using the very limited resources available to him. He was unable to work and missed out on the lives of his family and friends. He missed the funerals of loved ones, including his son, who passed away while he was wrongfully incarcerated.

141.    Logan was robbed of opportunities to pursue his interests and passions, build relationships, and continue the community work that provided his life with meaning.

142.    Logan has been deprived of all the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being. Logan must now attempt to make a life for himself outside of prison without the benefit of over two decades of life experiences, which normally equip adults for the task.

143.    Logan lived in constant emotional anguish, never knowing whether the truth would ever come out and whether he would ever be exonerated.

144.    As a result of the foregoing, Logan has suffered tremendous damage, including loss of liberty, physical injury, psychological trauma, and emotional damages, all caused by Defendants' misconduct.

## LEGAL CLAIMS

### COUNT I – 42 U.S.C.  § 1983
### Violation of Due Process under the Fourteenth Amendment

145.    Each paragraph of this Complaint is incorporated as if restated fully herein.

146.    As described above, Defendant Officers and Sinson, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Logan of his constitutional right to due process and a fair trial.

147.    As described above, Defendant Officers and Sinson fabricated and solicited false evidence, including statements and testimony they knew to be false, fabricated police reports and other evidence falsely implicating Logan, suborned perjury, obtained Logan's conviction and continued prosecution using that false evidence, and failed to correct fabricated evidence they knew to be false when it was used against Logan during his criminal case.

148.    As described above, Defendant Officers and Sinson deliberately withheld exculpatory and impeachment evidence from Logan, his attorneys, and prosecutors, among others, thereby misleading and misdirecting Logan's criminal prosecution. Defendant Officers and Sinson also destroyed and/or intentionally lost material evidence. In doing so, Defendant Officers and Sinson violated their clearly established duties to disclose all exculpatory and impeachment information to prosecutors, to preserve material evidence, and to ensure the integrity of eyewitness identifications and statements.

149.    Defendant Officers and Sinson concealed, fabricated, and/or destroyed additional evidence that is not yet known to Logan.

150.    As described above, Almazan, Higgins, Van Witzenberg, O'Boyle, Bernatek, and Halloran also procured the supposed eyewitness identifications of Plaintiff, implicating him in the crime, by using unduly suggestive identification techniques. Defendants used the resulting false identifications to taint Plaintiff's criminal trial. The identification procedures were so unnecessarily suggestive and conducive to irreparable mistaken identification that its use violated due process of law.

151.    Defendant Officers and Sinson's misconduct resulted in Logan's unjust and wrongful criminal prosecution and conviction, thereby denying him his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Logan could not, and would not, have been pursued, and there is a reasonable probability that the outcome of Logan's criminal trial would have been different.

152.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, with reckless indifference to the rights of others, and in total disregard of the truth and Logan's clear innocence.

25

153.     As a direct and proximate result of Defendants' misconduct, Logan suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

154.     The misconduct described in this Count by Defendant Officers was undertaken pursuant to the policy and practice of the City, in the manner more fully described below in Count V.

### COUNT II – 42 U.S.C. § 1983
### Deprivation of Liberty without Probable Cause in Violation of the Fourth Amendment

155.     Each paragraph of this Complaint is incorporated as if fully restated herein.

156.     As described above, Defendant Officers and Sinson, acting as investigators and without probable cause to suspect Logan of any crime, individually, jointly, and in conspiracy with one another, and others unknown, as well as under color of law and within the scope of their employment, used fabricated evidence to accuse Logan of criminal activity and detain him without probable cause.

157.     In so doing, Defendant Officers and Sinson caused Logan to be deprived of his liberty and detained without probable cause, in violation of his rights secured by the Fourth Amendment and incorporated by the Fourteenth Amendment. Specifically, Logan was incarcerated from the date of his arrest until nearly 23 years later.

158.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, with reckless indifference to the rights of others, and in total disregard of the truth and Logan's clear innocence.

159.     As a direct and proximate result of Defendants' misconduct, Logan suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

160.    The misconduct described in this Count by Defendant Officers was undertaken pursuant to the policy and practice of the City, in the manner more fully described below in Count V.

## COUNT III – 42 U.S.C. § 1983
### Failure to Intervene

161.    Each paragraph of this Complaint is incorporated as if fully restated herein.

162.    As described above, during the constitutional violations described herein, one or more of Defendant Officers and Sinson stood by without intervening to prevent the violation of Logan's constitutional rights, even though they had the duty and the opportunity to do so.

163.    Defendant Officers and Sinson had reasonable opportunity to prevent this harm but failed to do so.

164.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, with reckless indifference to the rights of others, and in total disregard of the truth and Logan's clear innocence.

165.    As a direct and proximate result of Defendants' misconduct, Logan suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

166.    The misconduct described in this Count by Defendant Officers was undertaken pursuant to the policy and practice of the City, in the manner more fully described below in Count V.

## COUNT IV – 42 U.S.C. § 1983
### Conspiracy to Violate Constitutional Rights

167.    Each paragraph of this Complaint is incorporated as if fully restated herein.

168.   In investigating the murder of Jones, Defendant Officers and Sinson agreed among themselves and with other individuals to act in concert in order to deprive Logan of his constitutional rights, including his rights to due process and a fair trial, as described above.

169.   Additionally, before and after Logan's conviction, Defendant Officers and Sinson further conspired to deprive Logan of favorable information to which he was lawfully entitled and which would have led to not being charged, acquittal, or faster exoneration.

170.   In this manner, Defendant Officers and Sinson, acting in concert with other unknown co-conspirators, conspired by concerted actions to accomplish an unlawful purpose by unlawful means.

171.   In furtherance of the conspiracy, each co-conspirator engaged in and facilitated numerous overt acts, including but not limited to those set forth above—such as fabricating evidence and withholding exculpatory evidence—and was otherwise a willful participant in joint activity.

172.   As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Logan suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

173.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others and with total disregard for the truth and Logan's clear innocence.

174.   The misconduct described in this Count by Defendant Officers was undertaken pursuant to the policy and practice of the City in the manner more fully described in Count V.

**COUNT V – 42 U.S.C. § 1983**
**Policy and Practice Claim against the City of Chicago**

175.     Each paragraph of this Complaint is incorporated as if fully restated herein.

176.     As described in detail above, Defendant City of Chicago is liable for the violation of Logan's constitutional rights because his injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of final policymakers for the City.

177.     At all relevant times and for a period of time prior thereto, the City and its final policymakers failed to promulgate proper or adequate policies or procedures for: conducting photographic lineup procedures by officers; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; the conduct of interrogating witnesses and obtaining their statements and testimony; and maintenance of investigative files and disclosure of those files in criminal proceedings. The City and its final policymakers failed to promulgate adequate policies or procedures on these topics although the need for such policies and procedures was obvious, given the recurring situations faced by officers, in order to prevent the violation of citizens' constitutional rights.

178.     In addition, the City and its final policymakers failed to promulgate proper or adequate policies or procedures for training, supervision, and appropriate discipline of CPD officers on these topics.

179.     The failure to promulgate proper or adequate policies or procedures was committed by persons with final policymaking authority in the CPD and the City.

180.     At all relevant times and for a period of time prior thereto, there existed widespread practices and customs among officers of the CPD, under which criminal suspects and witnesses were coerced to involuntarily implicate themselves or others by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and

uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional rights; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers such that the coercive interrogations continued unchecked.

181.    In addition, at all relevant times and for a period of time prior thereto, there existed widespread practices and customs among officers of the CPD, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain or preserve evidence or destroyed evidence; and (5) officers pursued wrongful convictions through profoundly flawed investigations.

182.    At all relevant times and for a period of time prior thereto, the City and its final policymakers had notice of the above-referenced widespread practices and customs. For instance, it was common that suspects were prosecuted based on fabricated evidence and/or coerced confessions, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures, and that exculpatory and impeaching evidence was suppressed.

183.    The widespread practices and customs described above, individually and together, were allowed to flourish because the leaders, supervisors, and final policymakers of the City directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers on these topics, and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Logan.

184.    The above-described widespread practices and customs, so well settled as to constitute *de facto* policies of the City, were able to exist and thrive, individually and together, because final policymakers exhibited deliberate indifference to the problem, thereby effectively ratifying it.

185.    The policies, practices, and customs set forth above have resulted in numerous well-publicized wrongful convictions, including the one at issue here, where individuals were convicted of crimes they did not commit after witnesses were subjected to coercive interrogations and/or unduly suggestive identification procedures.

186.    In addition, the misconduct described herein was undertaken pursuant to the policies and practices of the City in that the constitutional violations committed against Logan were committed with the knowledge or approval of persons with final policymaking authority for the City or were actually committed by persons with such final policymaking authority.

187.    Defendant Officers acted pursuant to the City's policies, widespread practices, and customs in engaging in the misconduct described in this Complaint. Logan's injuries were directly and proximately caused by the City's policies, widespread practices, and customs.

188.    Specifically, Logan's injuries were caused by the policies, widespread practices, and customs of the City in that officers and employees of the City regularly failed to disclose

exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced suspect and witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated constitutional rights in a manner similar to that alleged here.

189.     The widespread practices described in the preceding paragraphs were also allowed to flourish because the City declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and suspect or witness statements, and pursued wrongful convictions.

190.     Indeed, the CPD's systems for investigating and disciplining police officers accused of the type of misconduct that affected Logan was and is, for all practical purposes, nonexistent. The CPD maintained a code of silence that effectively eliminated any form of accountability, discipline, or oversight.

191.     Chicago police officers who manufactured criminal cases against individuals like Logan had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter the cost. In this way, the City proximately caused abuses like Defendant Officers' misconduct at issue in this case.

192.     As a direct and proximate result of Defendant City's policies, widespread practices, and customs, Logan suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

### COUNT VI – State Law Claim
### Malicious Prosecution

193.     Each paragraph of this Complaint is incorporated as if fully restated herein.

194.   Defendant Officers and Sinson, acting as investigators, individually, jointly, and in conspiracy with one another, accused Logan of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

195.   Defendant Officers and Sinson caused Logan to be improperly subjected to judicial proceedings for which there was no probable cause.

196.   These judicial proceedings were instituted and continued maliciously, resulting in injury.

197.   Statements of Defendant Officers and Sinson regarding Logan's alleged culpability were made with knowledge that said statements were false and perjured. Defendants also fabricated evidence, coerced false inculpatory statements from witnesses, and withheld exculpatory evidence that would have demonstrated Logan's absolute innocence, destroyed material and/or exculpatory evidence, and used unduly suggestive identification procedures.

198.   Defendant Officers and Sinson were aware that, as described more fully above, no true or reliable evidence implicated Logan in the Jones murder.

199.   Defendant Officers and Sinson intentionally withheld from and misrepresented to the trial prosecution facts that further vitiated probable cause against Logan, as set forth above, and withheld the facts of their manipulation and the resulting fabrications from Logan.

200.   The judicial proceedings were terminated in Logan's favor when all charges against him were dismissed in September 2023.

201.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Logan's clear innocence.

202.     As a direct and proximate result of Defendants' misconduct, Logan suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

**COUNT VII – State Law Claim**
**Intentional Infliction of Emotional Distress**

203.     Each paragraph of this Complaint is incorporated as if fully restated herein.

204.     The acts and conduct of Defendant Officers and Sinson as set forth above were extreme and outrageous. Defendants' actions were rooted in an abuse of power or authority and were undertaken with intent to cause, or were in reckless disregard of, the probability that their conduct would cause, severe emotional distress to Logan, as more fully alleged above.

205.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Logan's clear innocence.

206.     As a direct and proximate result of Defendants' misconduct, Logan suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional distress and damages, as set forth above.

207.     As a result of Defendants' misconduct described in this Count, Logan suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT VIII – State Law Claim**
**Civil Conspiracy**

208.     Each paragraph of this Complaint is incorporated as if restated fully herein.

209.     As described above, Defendant Officers and Sinson, acting in concert with other known and unknown co-conspirators, reached an agreement among themselves to frame Logan for a crime he did not commit and conspired by concerted action to accomplish an unlawful

purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Logan of these rights.

210.    In furtherance of the conspiracy, Defendant Officers and Sinson committed overt acts and were otherwise willful participants in joint activity including, but not limited to, the malicious prosecution of Logan and the intentional infliction of emotional distress upon him.

211.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Logan's clear innocence.

212.    As a direct and proximate result of Defendants' conspiracy, Logan suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

**COUNT IX – State Law Claim**
**Willful and Wanton Conduct**

213.    Each paragraph of this Complaint is incorporated as if fully restated herein.

214.    At all times relevant herein, Defendant Officers and Sinson had a duty to refrain from willful and wanton conduct in connection with the Jones murder investigation.

215.    As described herein, it was foreseeable to Defendant Officers and Defendant Sinson that fabricating evidence, and suppressing exculpatory evidence, in addition to the other misconduct alleged above, in order to frame Logan, would inevitably result in extreme harm to him. Avoiding this injury to Logan would not have burdened Defendant Officers or Defendant Sinson in any way.

216.    Notwithstanding that duty, Defendant Officers and Defendant Sinson acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Logan's rights.

217.    As a direct and proximate result of Defendants' misconduct, Logan suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

## COUNT X – State Law Claim
### *Respondeat Superior*

218.    Each paragraph of this Complaint is incorporated as if restated fully herein.

219.    In committing the acts alleged above, each of Defendant Officers were members and agents of, the CPD, acting at all relevant times within the scope of their employment and under color of law.

220.    Defendant City of Chicago is liable as principal for all torts committed by its agents under state law.

## COUNT XI – State Law Claim
### Indemnification

221.    Each paragraph of this Complaint is incorporated as if restated fully herein.

222.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

223.    Defendant Officers are or were employees of the CPD, who acted within the scope of their employment in committing the misconduct described herein.

224.    Defendant City of Chicago is responsible for paying any judgment entered against Defendant Officers. Logan therefore demands judgment against Defendant City of Chicago in the amounts awarded to Logan against Defendant Officers as damages, attorneys' fees, costs, and interest.

225.    Defendant Sinson was an employee of CCSAO, who acted within the scope of his employment in committing the misconduct described herein.

226.     Cook County is responsible for paying any judgment entered against Defendant Sinson. Logan therefore demands judgment against Defendant Cook County in the amounts awarded to Logan against Defendant Sinson as damages, attorneys' fees, costs, and interest.

WHEREFORE, Plaintiff Leonard Logan respectfully requests that this Court enter judgment in his favor and against Defendants City of Chicago, Glenn Evans, Alejandro Almazan, Edward O'Boyle, Lawrence Lynch, Sylvia Van Witzenburg, Paul Bernatek, William Halloran, Hasan Al-Amin, Michael Rowan, Geri Lynn Yanow, Special Representative of deceased Defendants Philip Graziano and William Higgins, Kent Sinson, and Cook County, Illinois, awarding compensatory damages, attorneys' fees, and costs against each Defendant, punitive damages against each of the individual Defendants, pre- and post-judgment interest, and any other relief that this Court deems just and appropriate.

### JURY DEMAND

Plaintiff Leonard Logan hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

LEONARD LOGAN

BY: s/ Elizabeth Wang
*One of Plaintiff's Attorneys*

Tara Thompson
Jon Loevy
Alyssa Martinez
LOEVY & LOEVY
311 N. Aberdeen, 3d. Fl.
Chicago, IL 60607
O: 312.243.5900
tara@loevy.com
jon@loevy.com
alyssa@loevy.com
*Counsel for Plaintiff*

Elizabeth Wang
LOEVY & LOEVY
2060 Broadway, Ste. 460
Boulder, CO 80302
O: 720.328.5642

elizabethw@loevy.com