**TRANSCRIBED FROM DIGITAL RECORDING**

                IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
                        EASTERN DIVISION

LEONARD LOGAN,                          ) Case No. 24 C 3897
                                        )
              Plaintiff,                 )
                                        )
         vs.                            )
                                        )
CITY OF CHICAGO, et al,                 ) Chicago, Illinois
                                        ) April 2, 2025
         Defendants.                    ) 10:01 A.M.

         TRANSCRIPT OF PROCEEDINGS - DISCOVERY HEARING
      BEFORE THE HONORABLE YOUNG B. KIM, Magistrate Judge

APPEARANCES:

For the Plaintiff:        LOEVY & LOEVY
                          311 North Aberdeen Street
                          3rd Floor
                          Chicago, Illinois  60607
                          BY:  MS. ALYSSA MARTINEZ
                               MS. TARA THOMPSON

For Defendant City:       KULWIN, MASCIOPINTO & KULWIN, LLP
                          161 North Clark Street
                          Suite 2500
                          Chicago, Illinois  60601
                          BY:  MR. ANTHONY MASCIOPINTO
                               MS. NATALIE JANE SMITH

For Individual Defendants:HALE LAW LLC
                          53 West Jackson Boulevard
                          Suite 330
                          Chicago, Illinois  60604
                          BY:  MS. ALLYSON LYNN WEST


                  PAMELA S. WARREN, CSR, RPR
                Official Court Reporter - Retired
                   23869 N. High Ridge Drive
                 Lake Zurich, Illinois   60047
                       312.823.0001


NOTE:  Please notify of correct speaker identification.

APPEARANCES:  Continued

For Defendant Sinson:          HINSHAW & CULBERTSON
                               151 North Franklin Street
                               Suite 2500
                               Chicago, Illinois  60606
                               BY:  MR. MATTHEW R. HOWROYD

For Defendant Cook             COOK COUNTY STATE'S ATTORNEY'S OFFICE
County:                        500 Richard J. Daley
                               Chicago, Illinois  60602
                               BY:  MS. KELLI HUNTSMAN

(Proceedings held in open court:)

THE CLERK:  24 C 3897, Logan versus City of Chicago, et al.

THE COURT:  Good morning.  Who is here on behalf of the plaintiff?

MS. MARTINEZ:  Alyssa Martinez and Tara Thompson on behalf of plaintiff, your Honor.

THE COURT:  For the city.

MR. MASCIOPINTO:  For the city, your Honor, Tony Masciopinto, M-A-S-C-I-O-P-I-N-T-O, and Natalie Smith for the city defendant.

THE COURT:  Let's see.  For the individual defendants.

MS. WEST:  Good morning, your Honor.  Allyson West on behalf of the individual defendant officers.

THE COURT:  For the county.

MS. HUNTSMAN:  Good morning, your Honor.  Kelli Huntsman on behalf of the county.

THE COURT:  And for Mr. Sinson.

MR. HOWROYD:  Good morning, your Honor.  Matt Howroyd, H-O-W-R-O-Y-D, on behalf of former assistant State's Attorney Sinson.

THE COURT:  Okay.  Great.

I'd like to first address plaintiff's discovery issues.  And the first issue is over documents related to the criminal investigation of the defendant Glenn Evans, more

specifically nonresponse to plaintiff's Request For Production Numbers 10 and 59.

So let me ask you, Ms. West -- or actually, this is also a question for the city as well. My question is -- actually it is really for the city given that there is broad Monell claims here. Mr. Masciopinto, the city would not use any type of information about criminal investigations of police officers?

MR. MASCIOPINTO: No, your Honor, I can't envision the need for that data in a Monell claim, so that's correct.

THE COURT: Okay. Because one of the issues I think is that there is this code of silence that the city essentially endorses.

But if the city is not going to use it, let me ask you, Ms. West, will the investigation be used in any way on behalf of the individual defendants?

MS. WEST: No, your Honor.

THE COURT: So then let me turn to the plaintiff. What's the relevance of this investigation that took place in 2013, 16 years after the arrest in question?

MS. MARTINEZ: I think --

THE COURT: Ms. Martinez.

MS. MARTINEZ: Oh, apologies, your Honor. Alyssa Martinez on behalf of plaintiff.

I think it is two-fold, your Honor. I think the first

piece is kind of directly related to the underlying case here because of the specific history between defendant Evans and the plaintiff and specific allegations from the interaction that they had the year before the facts at issue in this case.

And please feel free to jump in. My colleague.

But -- and I think the second piece is that specifically for -- as this Court has pointed out, the Monell allegations and the 404(b) witnesses that plaintiffs have disclosed on their 26(a)(1)s, we think that this investigation would pertain to those allegations as well.

MS. THOMPSON: I mean, I -- this is Ms. Thompson.

THE COURT: Ms. Thompson.

MS. THOMPSON: Thank you, your Honor.

THE COURT: Make sure the microphone is close to you.

MS. THOMPSON: Thank you, your Honor.

I mean, this -- I think the other issue that's important for 404(b) purposes is that the issues -- the specific incident that was investigated in that criminal investigation was also not an isolated incident for Glenn Evans in terms of investigation into misconduct by him. I mean, it is part of a -- it is plaintiff's position that it is part of a pattern of misconduct.

We don't also know with that investigation whether evidence from that criminal investigation is only going to relate to the incident for which he was being investigated and

charged in that case or other misconduct as well. Whether there was basically 404(b) investigation that happened in the context of that investigation.

So without knowing what the scope of that investigation was, what that -- what was investigated as part of that case, it is hard for us to make an argument. It is hard for, I think, us to say -- I think we are entitled to investigate -- to see what was investigated in that case in order to make an argument about relevance.

I mean, this is about discovery, not admissibility. And on that -- in that context, this is information that will be relevant for 404(b) purposes and for the other purposes that my colleague alluded to.

THE COURT: But I guess I'm more focused on -- well, let me ask you this. What do you know about the criminal investigation to date?

MS. THOMPSON: For that particular case, your Honor?

THE COURT: Yes. Ms. Thompson?

MS. THOMPSON: The -- that case involved a situation where someone claimed that he was assaulted by Glenn Evans, that Glenn Evans put his gun into that person's mouth in the course of assaulting him. I mean, that was the basic charge in that case. Obviously there was a bench trial at which Mr. Evans was acquitted, and those are the basic facts as we understand them.

THE COURT: So he could arguably say he was falsely accused, like your client is arguing in this case?

MS. THOMPSON: He was acquitted at a criminal case, and that's certainly what I -- I assume his position at the criminal case was that he -- that had not occurred. I mean, that is what he argued in his own defense at that trial, that that person was lying about what happened. Obviously, there was evidence to the contrary, which is why he was charged.

THE COURT: Are you arguing for the defendants or for your client here?

MS. THOMPSON: I'm arguing for my -- I'm arguing for my client. I'm acknowledging that he was acquitted at a bench trial. That's what I am saying, your Honor, he was acquitted.

THE COURT: Well, here's my problem. This happened 16 years after the arrest. How does it fit into what's going on in this case? Essentially the argument here, or at least the claim against Evans is that he fabricated witness statements about Mr. Logan, right?

MS. THOMPSON: That's true. But as my colleague alluded to, Glenn Evans's involvement in this case arose out of a specific motive to frame our client, which also has to do with an assertion by our client that Glenn Evans assaulted him with a gun and he shot him.

THE COURT: I get that.

MS. THOMPSON: I mean --

THE COURT: But what has that got to do with what happened in 2013 in the future?

MS. THOMPSON: For 404(b) purposes both the -- both this incident is really, you know, one -- we believe is one in a chain of misconduct by Glenn Evans. As I said, for 404(b) purposes, if all we had on Glenn Evans was the things that happened in connection with our client's prosecution and something that had had happened a long time later, then there might be an argument that that's an attenuated situation.

But it is not the only thing. There -- we believe through discovery we're going to be able to show that there is intervening events as well. That this is part of a chain of misconduct. So even though it is timewise far away, there is other misconduct in the middle that will make this part of the kinds of things that 404(b) speak to, which is pattern, you know, MO. All the things that make that event and other events about misconduct by Glenn Evans relevant to our client.

And again, this is about discovery, not about ultimate admissibility. We have to have details about that in order to make our 403 arguments -- 404(b) arguments for admissibility at trial.

THE COURT: Exactly what did Mr. Evans do -- Officer Evans do to frame Mr. Logan in this case?

MS. THOMPSON: The evidence that we have shows that he was part of this conspiracy to frame him, including by

procuring false statements against him and also lying about the circumstances of his arrest.

THE COURT: Arrest when?

MS. THOMPSON: Mr. Logan's arrest in this --

THE COURT: For the murder case?

MS. THOMPSON: Exactly, yes, your Honor.

THE COURT: So do we have reports authored by Mr. Evans or, I should say, Officer Evans?

MS. THOMPSON: We have -- from what we received in discovery so far, we have paperwork reflecting his involvement in the investigation. I don't think we have -- we don't have reports authored by him in the same way, but we know he was involved in the arrest and participated in, in fabricating evidence about that.

We know that in part from testimony he gave at Mr. Logan's trial. Although, obviously, the testimony itself is not the fabrication. But we know that he was involved in the arrest. And we have reports related to information that he's -- that was documented as coming from him as part of the investigation.

THE COURT: What was his testimony at trial, do you recall?

MS. THOMPSON: He testified in the sentencing proceeding about the circumstances --

THE COURT: Oh.

MS. THOMPSON: -- of the arrest.

THE COURT: Not the actual underlying criminal trial?

MS. THOMPSON: Right. At the sentencing -- he testified at sentencing.

THE COURT: So wait a second. So nothing that Officer Evans procured was introduced as evidence at trial?

MS. THOMPSON: Well, we don't fully know that. I mean, that is part of the purpose of discovery. We know he was --

THE COURT: What do you mean you don't fully know that? Do you not have the trial transcript?

MS. THOMPSON: No, we do, your Honor. But I think --

THE COURT: Okay. Then tell me what did -- what did Officer Evans procure was introduced as evidence in the underlying criminal case?

MS. THOMPSON: The reason why I think that's a complicated question to answer is because --

THE COURT: Well, let me -- go ahead and answer the --

MS. THOMPSON: Sure.

THE COURT: -- question first and then you can explain why it is complicated.

MS. THOMPSON: Well, I think we don't fully know is the short answer to that, your Honor. I mean, that is the purpose of discovery.

THE COURT: Thank you.

Response from Ms. West.

MS. WEST: Yes, please. Judge, a couple things. First of all, Glenn Evans testified at his sentencing. Counsel is correct, he did not substantively testify as to his role in this investigation because he had no role in this investigation. He relayed one -- and there is one piece of paper in the investigative file where Glenn Evans relays information to the detectives about checking out a family member to see about the location of Logan when they are trying to find him. That's it.

He was not a part of the underlying investigation, Judge. And there was no evidence that -- that was presented at trial relative to Glenn Evans's involvement in the murder investigation from 1997.

I think this is apples and oranges, Judge. Like the -- this case that happened in 2013 against Glenn Evans is about excessive force. We're talking about the allegation now and the case with Leonard Logan is merely fabrication, which, again, they aren't able to point to any sort of conspiracy just because he had a prior arrest of Leonard Logan in 1996 and somehow this is a retaliation.

When in reality, Judge, the arrest of Mr. Logan in 1996 by Mr. Evans, by Officer Evans happened in November of 1996. He -- Mr. Logan subsequently filed a federal lawsuit against Mr. Evans, but not until after he was arrested in June

of 1997.

So to claim that this is some sort of a conspiracy to retaliate against Mr. Logan is also misleading.

THE COURT: Well, I'm not going to get into the legitimacy or the merit of the retaliation theory. But as to the criminal investigation that took place in 2013, the Court sustains defendant's objection and not -- and the Court is not requiring the production of the investigation.

Not only do I find that the investigation is not relevant to the issues or defenses in this case, but certainly if there is any degree of relevance, such investigation is not proportional to the needs of the case.

Let me move on to the IR jackets. Exactly what is the agreement between the parties? I want to make sure that we are on the same page and we're not going to have issues later.

MR. MASCIOPINTO: Your Honor, the agreement --

THE COURT: Mr. Masciopinto.

MR. MASCIOPINTO: Thank you, your Honor. I apologize.

THE COURT: Can you get the microphone closer to you?

MR. MASCIOPINTO: The agreement, as I understand it, is that plaintiff's counsel will provide a list of names and identifiers to the extent that they have it, that is some subset of the Rule 26 names because those are unwieldy, and then we will go and request those IR jackets and criminal histories for those individuals. That in principle is fine

with the city.  We just need specificity and reasonableness from the other side, and then we'll go chase and get those documents.

THE COURT:  Okay.  Ms. Martinez or Ms. Thompson.

MS. MARTINEZ:  Yes, that's (unintelligible) as saying as well, your Honor.  I don't believe we have --

THE COURT:  Ms. Martinez?

MS. MARTINEZ:  I apologize.

THE COURT:  I'm just trying to make sure that the record is clean.  Go ahead.

MS. MARTINEZ:  I appreciate that.

That is the premise of the agreement that we have entered into.  The only thing I believe we didn't explicitly talk about is whether the list of names will be those currently identified on the parties's 26(a)(1)s.  New names could come out during the course of discovery that are not currently on those lists.  But I think in that instance we would be able to work together and find something that's reasonable.

THE COURT:  So what's going to happen after the city -- after you provide the list of names, the city provides the IR jackets, which I'm not familiar with, what happens after that IR -- after you review the IR jackets?

MS. MARTINEZ:  There isn't usually much follow-up discovery outside of, you know, potentially if there is a certain arrest for the time frame that we're looking at that

pertains to this case, then we might follow up and request that specific arrest report or that file from the city. But that's usually the extent of the follow up.

THE COURT: Okay. Thank you.

Let's talk a little bit about Monell discovery. There wasn't a whole lot said in the status report. First of all, I take it that Judge Alonso did not stay Monell discovery in this case.

MS. MARTINEZ: That's correct, your Honor.

MR. MASCIOPINTO: Judge, this is Mr. Masciopinto. We haven't sought a stay of Monell formally. Plaintiff's counsel in the Rule 37 meet and confer did not raise Monell discovery responses by us. If -- if we're going to go down that road, we're going to want an opportunity to file the motion. But because it seemed like plaintiff was standing down, at least that was my perspective on the written discovery relating to Monell, we didn't move formally. So that's what's -- that's the whole status from our perspective.

THE COURT: Ms. Martinez.

MS. MARTINEZ: Yeah, it is plaintiff's position that Monell should not be bifurcated. We think they can proceed parallel. And if any motion were to be filed by the city, we would oppose that motion.

THE COURT: So we do have a disagreement over Monell discovery. Doesn't appear that the city responded fully to

discovery on the Monell claims.

MR. MASCIOPINTO: No, we didn't. We objected across the board.

THE COURT: Okay.

MR. MASCIOPINTO: Pretty much. We didn't produce any policies and any other CR logs that were unrelated to the defendants here. So, yeah.

THE COURT: Let me ask you, Ms. Martinez, I know that -- I don't know whether you have litigated these cases, but certainly your law firm has, and there have been verdicts in favor of plaintiffs in other, you know, wrongful conviction cases. Do those cases result in any decisions on Monell claims?

MS. MARTINEZ: Yes, they have, your Honor. And specifically I'm thinking of Jacques Rivera's case and Mr. Fields's case. We got two Monell verdicts against the city. I don't have the years at the top of mine. I believe they might have actually been pertaining to street files a few years before this case. But we do have two verdicts against the city along those grounds.

THE COURT: Do you recall the relief that plaintiffs requested and received?

MS. MARTINEZ: I mean --

THE COURT: On the Monell claims, that is.

MS. MARTINEZ: Unfortunately, I don't recall that off

the top of my head. But I can find that information, your Honor.

THE COURT: Okay. Do you -- Mr. Masciopinto, do you know any kind of relief that the city had to satisfy as a result of verdicts against the city on Monell claims?

MR. MASCIOPINTO: I'm unaware. I know, the Fields's case was over -- I mean, I don't know, 15 years ago. I'm not aware, to answer your question. I am aware that most recently these cases -- I mean, there has been bifurcations and stays either by agreement or by the courts. Not universally. But that seems to be the trend.

THE COURT: Yeah. I mean, maybe I'm taking a very simplistic approach to Monell claims. I mean, they are always included in these types of cases, and not just wrongful conviction cases, but most 1983 cases have the Monell theory alleged.

You know, from my perspective, Monell claims are, I think, more suitable when the actual individuals who are engaged in a wrongful conduct can say, I didn't know that it was wrong, so I'm entitled to qualified immunity. And at that point the plaintiff should have some avenue of relief. So you go after the policymakers that, hey, you should have known better. And instead of having this policy that is basically required to be followed by others, you should have known better and therefore I should be somehow compensated.

But in situations where we have allegations that are pretty severe, fabrication of evidence, I mean, we kind of know that that's not really constitutional, right?

I can't ever imagine a situation where the individual defendants are found -- or I should say, they are qualified immune. They are immune under qualified immunity or that somehow they are going to be found -- I'm sorry, the city found guilty of Monell violation if individual defendants are not found liable. Do you follow me?

So the only reason I mention that -- and it is something that perhaps you can go back and see what kind of relief the Court awarded in those other cases where there were Monell violations and whether that relief is really something that is needed in this case.

I hate for the parties to spend time and money on Monell discovery when there isn't a whole lot even after plaintiff prevails on the claim.

I mean, at the end of the day, I think plaintiff is interested in monetary damages for the sufferings that he experienced. But again, that's certainly a viewpoint from here and not -- not having dealt with your clients, so. . .

All right. I don't know where we go with Monell discovery. I think that it is best for the city to be proactive and file a motion because plaintiff -- and I suppose you should confer first.

But let me give the city until 4-18 to make a decision on what do with Monell discovery, whether to file a motion or not to stay.

Any questions on that, Mr. Masciopinto?

MR. MASCIOPINTO:  No, your Honor.  Thanks.

THE COURT:  Okay.  Let me then turn to defendants's discovery issues.  Let me ask you, Ms. Martinez, did the plaintiff produce or I should say submit a verification page for the interrogatory answers?

MS. MARTINEZ:  I apologize, your Honor, I don't believe we did for his supplemental discovery responses.  We have got those verifications to him, and so we will hopefully have those provided to the parties this week.  And I apologize for the delay.

THE COURT:  It is not -- it is not that big of a deal because, you know, we have to deal with those Interrogatory Numbers 4 through 14, 16, 21, 23, and then we have got ASA Sinson's Interrogatory Numbers 1 and 2 that are in dispute.

So with respect to Interrogatories Numbers 4 through 14, I have gone through the answers, not every one of them.  I went through three to see, you know, what kind of answers are being provided.  And I do agree with defendants that they are not clear or adequate at this time.  I understand plaintiff's point that these are -- these can be characterized as contention interrogatories.  But that doesn't mean that

defendants are not entitled to an answer. The answer might be, I don't know at this point because we haven't completed discovery, and so that's my answer. But if that's your answer that's fine. There is nothing wrong with that. But to couch it in all these legalese and just general conclusions, I -- that type of answer is not adequate.

To the extent that plaintiff has information how each individual defendant contributed to the wrongful conviction, plaintiff needs identify those facts. We're only asking for facts here. And under Rule 26(e), plaintiff has the right to supplement as additional information is gathered through discovery.

And when you start coupling each defendant with other defendants, it becomes ambiguous as to exactly what you're saying, who did what, right? Again, I think the objections are not -- I don't think the objections have any merit. I think that plaintiff needs to simply say, this is what we know to date. We believe this defendant did these things. And that's all defendants are asking for. And certainly plaintiff can update that as time goes.

And you should also know that through depositions defendants are going to become aware of certain facts. So it is not as if you have to basically repeat what's been said on the record in your 26(e) supplement because the other side is now aware of these facts as well.

But I think that 4 through 14, they just need to be simpler, need to be cleaner and say this is what we know about this particular defendant, how he contributed to this problem.

So I am going to order plaintiff to redo the answers to 4 through 14.

And the same goes through 16 and 21. The withholding of exculpatory information I think is pretty easy to do. Like, hey, you forgot to say that we coerced somebody's testimony. You forgot to say that we made up stuff to prosecute Mr. Logan.

But in terms of specific evidence defendants fabricated, again, this is what we know so far. We believe this person did this coercion of testimony, Ms. Payton or fabrication of these police reports.

I'm not asking you, of course, for everything that can be derived through discovery. That's impossible to do.

Let me turn to Interrogatory Number 23. So how is plaintiff -- how are plaintiff's criminal activities related to the claim of emotional distress? Can you be more specific, Ms. West?

MS. WEST: Sure, Judge. I think, you know, if plaintiff intends to offer evidence as to damages that resulted from his alleged wrongful incarceration, his arrest, his prosecution, and subsequently that he's continued to suffer these damages and it has affected his life in various ways, I think it is relevant for us to be able to dive into what

activities, unlawful activities Mr. Logan is continuing to do, even after he has suffered such severe damages as a result of a prior arrest and a wrongful -- an alleged wrongful incarceration.

So I think when you cite the Cobige case, I think that getting into the facts of his lifestyle and the fact that he's continuing to engage in criminal activity post release, while they are going to stand up and say, you know, he, you know -- he was wrongfully committed -- he was wrongfully arrested, he was wrongfully prosecuted, he was wrongfully -- everything that my clients did basically placed him in the position that he is in now, and he has all these damages as a result. So in order to refute that, I think that the defense should be able to get into the type of lifestyle that he's leading, the fact that he's continuing to engage in criminal activity, even though he's claiming that he has such severe emotional trauma as a result of this.

And Judge, obviously we haven't taken plaintiff's deposition at this stage. But we fully expect, like in other cases, that we often hear that this individual is fearful of police because of such incidents and fearful of X, Y, or Z. So if Mr. Logan is going to put forth evidence that he's so fearful of the police relative to this 1997 incident, he's not fearful enough to stop him from engaging in criminal activity.

And I think that we should be able to bring up and

question him -- whether or not it is admissible later on, Judge, I think is a different question. But I think at this juncture we should be able to inquire as to the lifestyle that he's leading relative to how it affects his damages.

THE COURT: Response? Ms. Thompson.

MS. THOMPSON: Yes, your Honor. I mean, I -- we don't necessarily dispute that if plaintiff was asserting -- if he were asserting certain kinds of damages, that that might make certain facts about his life after release more relevant. But they are also making assumptions about what he's saying his damages are in this case.

So to me it is tied to specifically what he's saying about damages. And he has not asserted and is not going to assert damages that would -- that would make relevant, you know, times that he has -- you know, if he has other times that he has been charged or convicted since he was released. I mean, he is not intending to bring that period of his life into the case. And so given that he's not going to be bringing those issues into the case, there really isn't any relevance with this -- with this period of his life with respect to other cases that he may have post release.

THE COURT: Thank you.

I'm not seeing that link between so-called lifestyle after he's released and his damages. And even fearful -- being fearful of the police, I'm fearful of the police whenever I'm

driving.

But in terms of -- I don't see how criminal activities are related to his suffering from 23 years of what he considers to be unlawful incarceration. If you want to ask about his lifestyle after the -- after his release, you can certainly do that at a deposition. I just don't see the need to burden Mr. Logan with having to answer interrogatory answer on this particular issue.

And quite frankly, as Ms. Thompson points out, it would be better in that situation because Mr. Logan would be able to tell you during his deposition what he suffered from, what he is experiencing right now, and that would be more appropriate. And perhaps at that point a link can be established. So I'm not going require Mr. Logan to answer Interrogatory Number 23.

So in terms of ASA Sinson's Interrogatory Number 1, let me get to that. So I'm trying to figure out what is lacking in answer to Number 1. And I say that -- and this is for Mr. Howroyd.

MR. HOWROYD: Howroyd.

THE COURT: Howroyd.

MR. HOWROYD: Yes, your Honor. You're correct.

THE COURT: All right. So I know there is a whole lot of verbiage in between first supplemental answer, the bolded part, and page 4. But plaintiff says defendant Sinson

interrogated Payton and knowingly coerced Payton into signing a fabricated statement implicating plaintiff in the shooting. Sinson knew that the statement was false.

So what more do you want?

MR. HOWROYD: Judge, they are alleging that he knowingly coerced Ms. Payton. But there is no answer to what coercion took place. What did he do? Did he say something? Did he do -- take some action in order to coerce her to sign what they allege to be a false statement, your Honor?

There is simply sort of rehashing the complaint that Sinson coerced her. But there is no specificity, your Honor, as to what level or what type of coercion took place. So that is what Sinson is seeking is some sort of specificity, whether that's documents or written testimony that supports that allegation that there was some level of coercion, your Honor.

THE COURT: Ms. Martinez or Ms. Thompson.

MS. MARTINEZ: I would just say, your Honor, I think we're so early in discovery, and plaintiff obviously wasn't in the room. So that level of specificity I don't think, you know, anyone has yet, outside of Ms. Payton or the people who were present, and none of those depositions have happened yet.

But we are obviously happy to, you know, supplement this as it goes on. But plaintiff put in the facts as he was aware of them to respond to that interrogatory at this stage of this case.

THE COURT: Okay. Then here's what I ask -- I'm sorry, Ms. Thompson, you wanted to say -- you want to add to that?

MS. THOMPSON: Well, the only thing I'd add, your Honor, is that we do have testimony from Ms. Payton about her understanding of what occurred. So this is not really a black box situation. I mean, I think if -- I mean, I think the Court was about to give its direction about this, which we should take.

But I would just say that if what counsel is asking for is for some definition basically of coercion, we know what Ms. Payton has said occurred in the room. So this really is just restating at this point, to my counsel's point, about what she's testified to, which is information all the parties have access to, and more will be forthcoming through discovery.

THE COURT: Parties -- in civil litigation, parties say that all the time. You know, the other side knows about this. They have possession. But you have to remember, interrogatory answers carry an evidentiary value to the extent that they can be considered admission at trial. So what we need is on page 4, the paragraph starting with plaintiff also states, you can say, to date what we know is that Ms. Payton said these things took place.

I think it is not disputed that Ms. Payton did not know who was who in the room at the time, right?

MS. THOMPSON: She had some confusion about that, I agree, your Honor.

THE COURT: Okay. So, you know, so all you can do is what she said. And you can add that because it is important to know -- and part of discovery is to sort of cabin each side's evidence, right, to make sure that this is what's going to be presented at trial. So that's why it is important.

And this objection -- and it reminds me that I need to comment on this particular objection where -- oh, there are two things that I need to comment on. And I don't think that it is really unique to this particular situation. But for all -- all other cases. So I'm looking at Document 86 dash 3, page 2. And it says, plaintiff further objects to this interrogatory because information responsive to this inquiry is principally in the possession, custody, or control of defendants. That's not -- that's not a proper objection. That basically says, okay, we're going to just live with what you know as being the fact. That's not what you are saying. So you don't want to make that objection.

The other objection that I don't particularly like is, plaintiff directs defendants to the documents he has produced. Unless you're actually identifying specific pages, that is sort of meaningless. It doesn't really say much. Which documents are you talking about?

So those are two things that you need to be aware of

when you supplement the answers to the interrogatories.

So Number 2, so I am asking plaintiff, Mr. Logan, to supplement his answer to Sinson's Interrogatory Number 1. And I think Number 2 is the same thing. Tactics -- we're talking about what in fact Ms. Payton experienced during the meeting with Mr. Sinson. Again, all you can do is just put down what Ms. Payton said. And obviously you can supplement when she is deposed.

So I am going to require the supplement of answers to 1 and 2 served by Mr. Sinson.

I'd like to move to the subpoenas that are outstanding. Can somebody give you me an update? I don't know who served these subpoenas, one, two, three, four, five, six, seven, eight... there are 10 subpoenas outstanding or --

MS. WEST: No. So --

THE COURT: Ms. West.

MS. WEST: Yes. I can give you a little bit of an update. So with regard -- we'll just go in order here, Judge. The Public Defender's Office, we have received documents back. The State's Attorney's Office, we have also received responsive documents. However we have begun the meet and confer process with the State's Attorney's Office over a relatively lengthy privilege log. They have six different sets of privilege logs relative to the responsive documents. So we have begun that meet and confer there.

With regard to the Exoneration Project, counsel, plaintiff's counsel and I had correspondence just yesterday. And I believe those documents are going to be forthcoming by the end of the week.

MS. THOMPSON: That's correct, your Honor.

MS. WEST: Sheriff's Office, we have received responsive documents.

Medical examiner's office, we have received documents.

ISP, we received responsive documents.

With regard to Connect Network, we sent out a supplemental -- I'm sorry. So let me back up, Judge.

With regard to the Connect Network, we originally had a dispute between the parties as to, I think, plaintiff's claim was it was overbroad. Judge, what we did this week was we sent an additional revised subpoena. We didn't hear an objection from counsel on it, which basically is asking for kind of the equivalent, Judge, of what we have been asking for with the Illinois Department of Corrections. It is like that initial log that we would receive relative to any electronic communications that a prisoner or Mr. Logan would have with the outside world. And then I'm hoping once we receive that log, then we can have a further meet and confer with plaintiff's counsel about specific individuals or specific communications that we would have access to.

The Prisoner Review Board, we have received.

Department of Corrections, Judge, we have also received that initial list of the phone logs. I anticipate by the end of the week we'll be able to reach out to plaintiff's counsel to identify the individuals in which we hope to seek the call logs for.

And the Attorney General's Office, we just got documents back in and produced.

THE COURT: Are you seeing any problems with any of the responses that you received, other than the Cook County State's Attorney's Office?

MS. WEST: No. No, your Honor.

THE COURT: So be on the lookout for the Court's ruling on Cook County State Attorney's Office's typical objections to subpoenas. I wish I had the case number. But once I issue it, maybe I'll let you know which case it is in an order in this case. Hopefully the Cook County State Attorney's Office will take that into consideration when meeting and conferring. I'm hoping to get that ruling out by next week.

MS. WEST: Thank you, your Honor.

THE COURT: All right. About the subpoenas, any issues from plaintiff's side?

MS. MARTINEZ: No, your Honor. I would just say plaintiff is also now in the process of conferring with the State Attorney's Office on the lengthy privilege logs. And I

think, depending on how the confirms go around, the communications or -- I believe counsel said the call logs, (unintelligible) call reportings from the logs --

MS. WEST:  I'm sorry, yes.

MS. MARTINEZ:  So there might be some dispute we can't agree on which call recordings may be appropriate.  But otherwise, no other issue with the subpoenas.

THE COURT:  Thank you.

Let me set a deadline for the supplemental answers. Today is the 2nd.  Let me ask you, Ms. Martinez, can we get the supplemental answers served with verification by April 18th?

MS. THOMPSON:  I think we can get the answers served. We might need an additional week for the verifications, just to get forms back from our client.  But we can get the answers by the 18th.

THE COURT:  That's okay, then.  We'll just get everything done so that we have complete submission to the defendants by April 25.

I'd like to have a status hearing by phone -- actually then let's have April 25 as the deadline for the city to decide whether to file a motion.

Okay, Mr. Masciopinto?

MR. MASCIOPINTO:  Yes, your Honor.

THE COURT:  So the motion to stay to be filed by April 25, if one is necessary.

Can you check your calendar for May 9, 10:00 A.M. for a phone status hearing?

MS. WEST:  That works for the individual defendants.

MR. HOWROYD:  That works for ASA Sinson, your Honor.

MS. MARTINEZ:  That works for plaintiff, your Honor.

MR. MASCIOPINTO:  That's fine for the city, your Honor.  Thanks.

MS. HUNTSMAN:  And that's fine for the county, Judge.

THE COURT:  Great.  May 9 at 10:00 A.M.  And maybe we can get an update on what's going on with the Cook County State's Attorney's Office's documents at that point.

Anything else from the plaintiff today?

MS. MARTINEZ:  Nothing from plaintiff, your Honor.

THE COURT:  From any of the defendants?

MS. WEST:  Nothing, your Honor.

MR. HOWROYD:  Nothing.

MR. MASCIOPINTO:  Your Honor, there is --

THE COURT:  Mr. Masciopinto?

MR. MASCIOPINTO:  Yeah, sorry.  You know, we had a meet and confer with plaintiff's counsel about very narrow third-party subpoenas on some private criminal defense counsel.  They won't delay anything.  There is two outstanding criminal defense attorneys who are dodging me.  So I need to go back to plaintiff's counsel to see if I can issue the subpoenas to them, and we'll set up a procedure so they are protected.

But anyway, I just wanted that part of the record so you weren't surprised if something came up about that. But I don't anticipate any problems.

THE COURT: Are you trying to serve them personally?

MR. MASCIOPINTO: No. No. No. I have been trying to call them to see if they have records to begin with --

THE COURT: Oh.

MR. MASCIOPINTO: -- because that was the deal we cut --

THE COURT: Okay.

MR. MASCIOPINTO: -- with the plaintiff's counsel, and they are not returning calls. So --

THE COURT: Okay.

MR. MASCIOPINTO: Another person who doesn't want to talk to me, Judge.

THE COURT: All right. Thanks, everyone.

MS. MARTINEZ: Sorry, your Honor. If I may, super quickly. I just want to flag for the Court, the parties came to an agreement also on a HIPAA qualified protective order that we will be submitting --

THE COURT: Oh, yes.

MS. MARTINEZ: -- and file later today.

THE COURT: So actually not just a HIPAA, but also a confidentiality order that the parties were going to submit.

MS. MARTINEZ: I believe we did submit the protective

order and I believe it was entered, your Honor.  We just came to an agreement as to the terms of that order in light of this Court's ruling in Mr. White's case.

THE COURT:  Okay.  So you're ready to file the proposed HIPAA order?

MS. MARTINEZ:  Yes, that's correct, your Honor.

THE COURT:  When can you file that by?

MS. MARTINEZ:  We could do it today.

THE COURT:  All right.  So I'll just put it down as 4-4 is the deadline.

MS. MARTINEZ:  Okay.

THE COURT:  Great.  Thank you.

MS. MARTINEZ:  Thank you, your Honor.

MS. WEST:  Thank you, your Honor.

MR. MASCIOPINTO:  Thank you, your Honor.

(Which concluded the proceedings.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the digital recording of proceedings in the above-entitled matter to the best of my ability, given the limitation of using a digital-recording system.


*/s/Pamela S. Warren*                    April 30, 2025
Official Court Reporter – Retired                Date
United States District Court
Northern District of Illinois
Eastern Division