1

```
1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
2                             EASTERN DIVISION

3    LEONARD LOGAN,                       )  No. 24 C 3897
                                          )
4                       Plaintiff,        )
                                          )
5             vs.                         )  Chicago, Illinois
                                          )
6    CITY OF CHICAGO, et al.,             )
                                          )  July 31, 2025
7                       Defendants.       )  2:01 p.m.

8                        TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE YOUNG B. KIM, MAGISTRATE JUDGE
9
     APPEARANCES:
10
     For the Plaintiff:    LOEVY & LOEVY
11                         BY:  MS. JORDAN POOLE
                           311 North Aberdeen Street, Third Floor,
12                         Chicago, Illinois  60607

13   For Defendant
     City of Chicago:      KULWIN, MASCIOPINTO & KULWIN LLP
14                         BY:  MR. ANTHONY J. MASCIOPINTO
                                MS. NATALIE J. SMITH
15                         161 North Clark Street, Suite 2500,
                           Chicago, Illinois  60601
16
     For the Individual
17   Defendants:           HALE & MONICO LLC
                           BY:  MS. ALLYSON L. WEST
18                         53 West Jackson Boulevard, Suite 334,
                           Chicago, Illinois  60604
19

20
                           PATRICK J. MULLEN
21                    Retired Official Court Reporter
                      United States District Court
22                      219 South Dearborn Street
                        Chicago, Illinois  60604
23                          (708) 935-1931

24                       *   *   *   *   *

25       TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
```

```
 1    APPEARANCES:   (Continued.)

 2    For Defendant
      Kent Sinson:             HINSHAW & CULBERTSON LLP
 3                             BY:  MR. CHRISTIAN J. MICHALIK
                               151 North Franklin Street, Suite 2500,
 4                             Chicago, Illinois  60606

 5    For Defendant
      County of Cook:          HON. EILEEN O'NEILL BURKE
 6                             COOK COUNTY STATE'S ATTORNEY
                               BY:  MS. KELLI N. HUNTSMAN
 7                             69 West Washington Street,
                               Chicago, Illinois  60602
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        (Proceedings in open court.)

 2              THE CLERK:  24 CV 3897, Logan versus City of Chicago,

 3    et al.

 4              THE COURT:  Good afternoon.

 5              MS. POOLE:  Good afternoon, Your Honor.

 6              THE COURT:  For the plaintiff?

 7              MS. POOLE:  Jordan Poole here for the plaintiff.

 8              THE COURT:  For the city?

 9              MR.  MASCIOPINTO:  Good afternoon, Your Honor.  Tony

10    Masciopinto and Natalie Smith for the city.

11              THE COURT:  Okay.  And for, let's see, the county?

12              MS. HUNTSMAN:  Kelli Huntsman for Cook County, Judge.

13              THE COURT:  For the individual defendants?

14              MS. WEST:  Allyson West on behalf of the individual

15    defendants.

16              THE COURT:  And for Mr. Sinson?

17              MR. MICHALIK:  Christian Michalik on behalf Kent

18    Sinson, Judge.

19              THE COURT:  Thank you.

20              All right.  So let me hear defendants' response to the

21    motion to quash?

22              MS. WEST:  Sure.  And, Judge, I'm going to address the

23    categories which you told us to be prepared to discuss today.

24              THE COURT:  Ms. West.

25              MS. WEST:  Yes.
```

1        THE COURT:  I'm just saying your name for the record.

2  Go ahead.

3        MS. WEST:  Yes.  So, Judge, as you're well aware, this

4  is an issue that's been litigated over and over again in

5  numerous courtrooms within this courthouse, so I'll address

6  each of the points that you brought up in your minute order.

7  First let's discuss the privilege issue because I think that

8  this is a big issue that is somewhat undecided in this

9  building.

10        Plaintiff's counsel is asserting that any calls that

11  the defendants are seeking with regard to Mr. Logan's

12  conversations with his post-conviction attorney, Ms. Thompson,

13  who is also counsel of record in this litigation, is considered

14  privileged.  However, Judge, there are various cases that have

15  come down that said that because Mr. Logan was well aware and

16  any prisoner in Illinois Department of Corrections is well

17  aware of the fact that if they have not requested to have an

18  attorney call on a private line, those calls are, in fact,

19  recorded and there is a minimal privacy interest.

20        And, Judge, I think one of the biggest things is that

21  plaintiff's counsel only points to the fact that a -- let's

22  see.  In their motion, they say that a privilege may apply if

23  there is some impediment to the prisoner's access to the

24  unrecorded line for the calls.  I believe their argument is

25  that Ms. Thompson had time-sensitive issues that she needed to

1    speak with Mr. Logan about.  However, Judge, we're talking

2    about 115 calls, and the call logs are sometimes one day after

3    the next or they're one week apart.

4           So, Judge, I don't think that that's a good argument

5    to say that these were -- that all 115 calls were, in fact,

6    time-sensitive, Judge, and they should be or that the privilege

7    should apply to them.  I think that what we've got is that

8    several courts are saying that attorney-client privilege does

9    not apply to the recorded prison calls because there's no

10   reasonable expectation of confidentiality.  In fact, they know

11   the judge -- I'm sorry -- the prisoner as well as the attorney

12   is well aware of the rules with regard to what's being recorded

13   and what's not being recorded, Judge.

14          Another thing that occurred during our meet-and-confer

15   process, I pointed out to counsel for plaintiff that this is an

16   issue that's being litigated and has been litigated for the

17   last decade.  So the fact that they're going to claim that

18   either these were time-sensitive or they were unaware that

19   these calls were being recorded falls flat.  We've litigated

20   this issue with their office and, in fact, Judge, there are

21   several opinions that have come out from as far back as 2016 to

22   as early as 2020 with Loevy's office stating that there is not

23   an expectation of privilege with these calls.

24          So for those reasons with regard to the privilege

25   argument as to the calls with Ms. Thompson, Judge, I think that

1    they are discoverable, that they are not covered by a

2    privilege, and we should be entitled to have those phone calls.

3            THE COURT:  Well, let me stop you and ask Ms. Poole

4    some questions.

5            MS. WEST:  Sure.

6            MS. POOLE:  Sure.

7            THE COURT:  So there are 115.  By the way, where are

8    the parties with respect to these calls?  Do you only have the

9    call logs, or do you have the calls themselves?

10           MS. WEST:  No, just the call logs.

11           THE COURT:  Okay.  So 115 calls were placed between

12    Mr. Logan and Ms. Poole, right?

13           MS. POOLE:  Ms. Thompson.

14           THE COURT:  Oh, I'm sorry.  Yes, Ms. Thompson.  How

15    were those calls placed?

16           MS. POOLE:  My understanding, Your Honor, is they

17    would have been calls from Mr. Logan to Ms. Thompson.  She

18    wouldn't have been able to call him because he was

19    incarcerated.  Generally the practice would be to set up a

20    legal call, but as routinely happens, that process can be very

21    difficult.  There are time-sensitive issues that arise.

22         I believe during this time period, Ms. Thompson was

23    also representing Mr. Logan on a prisoner civil rights case as

24    well, and so there were quite a few things going on.  I think

25    most of the phone calls that are in the logs at least for

1    Ms. Thompson and Mr. Logan are in the 2014-2015 time period.

2    So to Ms. West's point, it's well before these issues were

3    being litigated, and I think the caselaw is fairly clear.  If

4    there's an expectation of privilege -- and there would have

5    been an expectation for Mr. Logan in speaking with his

6    attorney -- that that privilege still applies.  There are just

7    a number of logistical difficulties oftentimes in reaching your

8    client, and I think that's what Ms. Thompson encountered here.

9          THE COURT:  Well, first of all, the caselaw isn't

10   clear.  That's why this is being litigated before many courts,

11   right?  The Seventh Circuit hasn't said one way or the other,

12   but I think the Seventh Circuit has said in one of the cases

13   that you cited, Sandra -- is it Sandra E?

14         MS. POOLE:  I think that's right, Sandra TE, Your

15   Honor.

16         THE COURT:  Yes.  You know, the Seventh Circuit has

17   taken the position that the attorney-client privilege is

18   antithetical to the truth-seeking process because oftentimes

19   those communications can be very relevant, in fact, probably

20   most relevant.  So when you talk about privileged

21   communications, the Seventh Circuit requires that all of the

22   elements are strictly met in order for a communication to enjoy

23   that privilege.

24         So how do you respond to Ms. West's argument -- and

25   this is something that I thought of, too -- that there's no

1  expectation that it remains confidential?  How do we get around

2  that?

3        MS. POOLE:  You're referring just to the fact that

4  Ms. Thompson and Mr. Logan would have been aware that the calls

5  were recorded?

6        THE COURT:  Correct.

7        MS. POOLE:  I mean, I think that the expectation there

8  is that those calls were recorded for the purpose of safety

9  within the facilities themselves.  So oftentimes calls are

10  reviewed by folks at the prison to make sure there's no

11  contraband coming in and other things like that.  So I think

12  the expectation for folks, for incarcerated folks, is that

13  their calls were being monitored for those reasons, not for a

14  civil lawsuit that's going to come ten years later.

15        THE COURT:  Well, that may be, but the conversation

16  itself isn't confidential if others have access to that

17  conversation.

18        MS. POOLE:  I understand that point, Your Honor.  I

19  think the response or our response on that point is that,

20  again, Mr. Logan and Ms. Thompson might have been aware at the

21  time that those calls might have been reviewed, again, for

22  safety at the facility or for other reasons but otherwise are

23  confidential and weren't going to be disclosed, like I said,

24  ten years later in a civil rights lawsuit proceeding.

25        THE COURT:  Well, that's not the point, though.  The

1    point is in order for a communication to be considered

2    privileged, it's confidential.  The communication has to be

3    confidential.  Even if Mr. Logan's mother was in the law

4    office, that communication between Mr. Logan Ms. Thompson can't

5    be considered confidential.  Would you agree with me?

6           MS. POOLE:  I would agree, Your Honor.

7           THE COURT:  So what's the difference between a call

8    that can be listened to by anyone within IDOC?  How can you say

9    that's considered confidential?

10          MS. POOLE:  I think the distinction there, Your Honor,

11    is not every phone call is being listened to by IDOC.  But in

12    the case or the example with Mr. Logan's mother, she's

13    obviously there listening to conversations, but for the most

14    part the presumption is those calls are not being listened

15    unless there's some very specific reason.

16          THE COURT:  Okay.  Now move on to the next item.

17          MS. WEST:  Sure.  Judge, you asked us to address

18    relevancy.

19          THE COURT:  I'm sorry.  One more question.

20          MS. POOLE:  Sure.

21          THE COURT:  So how did Mr. Logan know to call

22    Ms. Thompson?

23          MS. POOLE:  I'm not sure, Your Honor.  Honestly, I

24    don't know what the content of those conversations were.  I'd

25    imagine that he would call whenever some immediate

1    time-sensitive need arose.

2            THE COURT:  Thank you.

3            Go ahead, Ms. West.

4            MS. WEST:  Sure.  Judge, with regard to relevancy,

5    we've got one, two, three, four, five, including Ms. Thompson,

6    five individuals that we sought calls with.  Judge, you may

7    have seen in plaintiff's motion an individual Bell Thompson.

8    Plaintiff is essentially conceding that this is a relevant

9    individual and that the call is relevant.  There are two calls

10   with that individual who was disclosed as an alibi witness in

11   plaintiff's habeas case and is also the source as an alibi

12   witness in this case.  So with regards to those two, I think

13   plaintiff has conceded.  Ms. Poole can correct me if I'm wrong.

14           With regard to Earlene Logan, Earlene Logan is a

15   witness that has been disclosed by plaintiff in this case.  In

16   the Rule 26 disclosures, plaintiff has disclosed her as having

17   knowledge of the investigation and plaintiff's alibi.  So,

18   Judge, I think that puts Ms. Logan at the forefront of being a

19   relevant witness.  She may have information to say about his

20   whereabouts at the time of the homicide as well as the

21   underlying investigation, and the information that she learned,

22   whether it be from Mr. Logan or another individual, that may be

23   something that was discussed during these phone calls.

24           Oh, in addition, Judge, with regard to family members,

25   so Ms. Logan is Mr. Logan's sister.  So, Judge, in response to

1    written discovery in this case, Mr. Logan says that part of his

2    damages are time away and loss of interaction with family

3    members.  Ms. Logan is a family member that he was obviously

4    speaking with at the time, so I think it does go to his damages

5    as well, her calls with him.

6           Moving on, Judge, Lasandra Smith.  Lasandra Smith is

7    the mother of Mr. Logan's children.  She is mentioned in the

8    police reports in the underlying investigation.  Plaintiff

9    argues in their motion that she has no knowledge of the

10   underlying crime.  However, she was spoken to by the defendants

11   in this case, and the calls with her are highly relevant given

12   the fact that plaintiff has alleged in this case that several

13   of the defendants, specifically one of the defendants,

14   defendant Evans, fabricated evidence, and other defendants went

15   along with and fabricated police reports regarding how violent

16   Mr. Logan was, and that information was received from Lasandra

17   as well as her mother, Judge.

18          There's a lot of information about domestic disputes

19   between the two and, Judge, she's highly relevant to the case

20   with regard to the fact that plaintiff is asserting that

21   evidence tied directly to Ms. Smith was fabricated by one of

22   the defendant officers.

23          I will say, Judge, with regard to the proportionality

24   for Ms. Smith, another issue with this, Judge, is that

25   Ms. Smith is a witness in the case that the defense has

1    disclosed as a witness.  However, Judge, we have had quite a

2    bit of difficulty in locating and being able to serve her in

3    this case.  So any communications that she had with Mr. Logan

4    over a phone call may be a very limited source that we're going

5    to be able to get our hands on to refute those allegations of

6    fabrication.

7           With regard to Ezzie Logan, Ezzie Logan is Mr. Logan's

8    late mother.  Judge, she is relevant to the proceedings.  The

9    calls are relevant because not only does it go towards damages,

10   but she also spoke to the police during the investigation when

11   they were looking for Mr. Logan.

12          Then again in 2015 in the post-conviction proceedings

13   she authored an affidavit detailing her involvement with a

14   named defendant, Mr. Evans, years prior.  Judge, how this

15   affidavit came about -- and it does follow the next timeline in

16   2015, and that would be when these phone calls were taking

17   place, Judge -- it's relevant how this affidavit came about and

18   how this information was developed.  Again, she is deceased,

19   Judge, so this may very well be our only source, source of

20   information if she were to discuss it with Mr. Logan on these

21   phone calls.

22          Judge, with Ms. Thompson, I think we discussed that a

23   little bit, Judge, but I think she is very relevant.  It's

24   likely that they were discussing matters directly related to

25   the underlying incidents, and I will say again I believe that I

1    had phone calls from 2013 to 2018 from Ms. Thompson.  I can go

2    back and check the call logs if counsel for plaintiff

3    represented they think it was like 2016 as what you said for

4    the end date.

5         MS. POOLE:  I mostly saw 2014 and 2015, and I would

6    argue, Your Honor, if it is 2018, it probably bolsters our

7    argument that they were speaking about that prisoner civil

8    rights case.

9         THE COURT:  Okay.

10        MS. POOLE:  So, Judge, I think the relevance of

11   Ms. Thompson is quite obvious here as it's directly related to

12   the underlying incident itself and potential claims of

13   innocence.

14        One other factor, Judge, is during this time period,

15   you know, there's post-conviction matters going on, and there's

16   a new theory that comes out eventually that there is, in fact,

17   another individual out there who committed the homicide.  So

18   whether or not that's discussed during those calls is something

19   that is also relevant to the proceedings.

20        THE COURT:  So you said that you have the call logs.

21   So how does the subpoena system work with IDOC?  What's been

22   your experience?  In other words, IDOC doesn't mind producing

23   calls based on whatever identifier you give them?

24        MS. WEST:  Correct, Judge.  So initially we've only

25   asked for just the call logs.  So based on the call log, you

1  can link the phone number to an individual, and then it gives

2  you a date range of all the dates that they spoke.  So, yes,

3  Judge, you can request:  I want a call between this number,

4  being Tara Thompson, and Mr. Logan, this date through this

5  date.

6          THE COURT:  So when was -- when did Mr. Logan transfer

7  into the IDOC system after the conviction?

8          MS. POOLE:  So the underlying crime was from 1997.  He

9  was sentenced in 2000, so I would assume at some point during

10 that time period.

11         THE COURT:  And he was released when, '23?

12         MS. POOLE:  2023, yes, Your Honor.

13         THE COURT:  And the post-conviction proceedings were

14 taking place between 2014 and 2015?

15         MS. POOLE:  Your Honor, my understanding -- and

16 Ms. West should correct me -- my understanding is that they

17 were primarily taking place in the 2023 time frame, although

18 there were some affidavits that were signed by folks in the

19 2014 and 2015 time periods.

20         THE COURT:  Okay.  All right.  I'm sorry.  You can go

21 ahead and continue.

22         MS. WEST:  Judge, if you'd like, I can move on to the

23 privacy interest, although I think we've kind of touch on that

24 a little bit.  Judge, I think that it is -- that the caselaw is

25 relatively clear with regard to the fact that there is a

1   limited expectation of privacy for individuals who are

2   incarcerated when they are speaking on a recorded line.  They

3   know when they enter IDOC and are given that handbook and are

4   told in the handbook that the calls will be recorded, and

5   there's also that opening tag line that comes on when they get

6   on the phone:  This is a recorded line.

7           So they're well aware, and courts have found that

8   there is a limited privacy interest, Judge.  So I think that

9   with the claims in the case and the individuals that we

10  specifically sought calls for, the burden tips in our favor.

11  I'm sorry.  The shift weighs in our favor, Judge.  You know,

12  the privacy interest is minimal, but our interest in getting

13  the calls and knowing the relevant information from family

14  members and witnesses who have been disclosed by the party is

15  highly relevant and tips the scales in our favor.

16          Judge, there's one more issue that you asked us to be

17  ready to address, and it's proportionality.  Judge, correct me

18  if I'm wrong, but I assume that you meant the burden in this

19  case as far as the expense with regard to proportionality.

20          THE COURT:  Well, it depends --

21          MS. WEST:  Sure.

22          THE COURT:  -- on the situation, but that's one

23  element, yes.

24          MS. WEST:  Right.  So with regard to that, you know, I

25  don't know that Ms. Poole addressed it specifically with regard

1    to that other than saying this would take approximately 300

2    hours of manpower to review these calls.  You know, if their

3    position is that these calls are irrelevant, it is a strategic

4    decision whether they want to choose to listen to all of these

5    calls or if they want to choose to listen to a certain amount

6    of calls.  But, Judge, the law is clear that the burden

7    objection is not for the party to make but, rather, the entity

8    from whom the subpoena is directed, which is IDOC.

9            Judge, Mr. Logan is the one that's going to be in the

10   best position to know if, in fact, he spoke with certain

11   witnesses about aspects of his case, and he could potentially

12   direct his counsel to those witnesses and those relevant time

13   periods as to whether they choose to go through the calls or

14   not.

15           Then like I said briefly, Your Honor, with regard to

16   the proportionality as far as not being able to get some of

17   this information from any other place, Judge, I think we've got

18   that with a few witnesses in this case, specifically with

19   Mrs. Logan, Mr. Logan's deceased mother, and also with regard

20   to Lasandra Smith, as I previewed the fact that we are having

21   grave difficulty getting Ms. Smith in to be deposed in this

22   case.

23           So I think overall, Judge, it weighs in our favor for

24   these calls to be produced in the litigation.  They are

25   discoverable at this point, Judge.  Obviously what's

1    discoverable at this point and what's admissible later on is

2    two different things.

3           THE COURT:  Ms. Poole, anything you wish to say?

4           I'm sorry.  Were you done, Ms. West?

5           MS. WEST:  Yes, Judge.

6           THE COURT:  Okay.  Go ahead, Ms. Poole.

7           MS. POOLE:  Yes, Your Honor.  If the Court has any

8    questions, of course, I am happy to try and answer them.  I

9    think, you know, from our perspective, I'm happy to go kind of

10   topic by topic in the same way Ms. West did.  But just as a

11   general matter, while we're not conceding the relevance of any

12   specific call, we're not coming in here today saying they can't

13   have any phone calls, Your Honor.

14          We're coming in here saying you can pick 200, which,

15   as Ms. West, said we've litigated this issue a number of times

16   and I think it's fairly consistent with the number of phone

17   calls courts generally grant in these kinds of situations.  You

18   can pick 200 of the calls that you think are most relevant to

19   your case, and then the unsaid part, of course, is after you've

20   reviewed the 200 calls, if you find something in there that you

21   think entitles you to get more calls, you know, you're welcome

22   to file or come to us and ask if you can have more calls.  If

23   we can't agree, you can come back to Court and ask for that as

24   well.

25          So we're not coming in here saying they can't have any

1  calls.  We're coming in here saying there's some limited subset

2  of these calls that are going to be relevant.  You have dates,

3  times, and people.  You can identify them.  As Your Honor

4  identified, there are specific time windows in this case,

5  right, 2014, 2015, in which folks are signing affidavits and

6  are otherwise working on post-conviction testimony or things

7  that are relevant to post-conviction hearings, and perhaps

8  defendants, you know, would choose to find those calls.  There

9  might be some more recent calls if they're looking for where

10  Ms. Smith might be living, right, and perhaps those are more

11  relevant more recently.

12       So we're not saying they can't have any phone calls.

13  We are saying that they should be limited in some specific way

14  to the phone calls that they identify as most relevant, because

15  I think we can all agree, right, in these 810 calls that not

16  all of them are going to be about this underlying crime.  Not

17  all of them are going to be anywhere close to relevant.

18  They're going to be Mr. Logan's private conversations.  Most of

19  these folks are his family members.

20       So I think that is a burden on somebody who is -- the

21  only reason we have these calls in the first place, right, is

22  because he was in there for a crime he didn't commit.  They're

23  personal and they're intimate, and they shouldn't be just

24  disclosed without limitation.

25       You know, we've worked well and had a compromise here

1    with these five individuals, but I still think that the 810

2    across this entire time frame are disproportionate to the real

3    needs of this case.

4              THE COURT:  Anything else?

5              MS. POOLE:  I'm happy to talk about the specific

6    witnesses, Your Honor, but I think it kind of comes back down

7    to my same argument, which is I'm not disagreeing that they can

8    have some number of phone calls with any of these five -- any

9    of the four people.  We disagree with Ms. Thompson, so with any

10   of the four people.  It's just that we would want or we'd ask

11   for those to be narrowed to a specific subset that are relevant

12   to this case.

13             THE COURT:  Thank you.

14             So when you subpoena call records, how are they

15   actually sent to the parties?

16             MS. WEST:  The actual recorded phone call?

17             THE COURT:  Correct.  Is it uploading a file, or are

18   they sending you a CD?

19             MS. WEST:  No, it's uploading of a file.  It's

20   electronically sent.

21             THE COURT:  So you actually use a link to download the

22   files from their server to listen to them.

23             MS. WEST:  Correct.

24             THE COURT:  Okay.

25             MS. WEST:  Correct me if I'm wrong.

1          MS. POOLE:  I think that's right.

2          MS. WEST:  Most of the time, we get this link, the

3    paralegal will download what's there, and then we look at it

4    and it's electronically there.

5          MS. POOLE:  That's correct to my understanding.

6          THE COURT:  Okay.  I do want to give the city an

7    opportunity to say anything if it wishes.

8          MR.  MASCIOPINTO:  Your Honor, I mean, we're aligned

9    and I echo the argument by Ms. West.  I would say in response

10   to what we just heard about a 200-call subset, I mean,

11   respectfully I think that's just an arbitrary number.  I think

12   we have narrowed it to five individuals.  It just so happens

13   that those five come to 810.  I know there were individuals I

14   wanted beyond the five that we yielded on.  I think the 200

15   number is going to be inefficient because inevitably there will

16   be nuggets in there, and then we'll be right back before Your

17   Honor and it will just be a delay.

18          And lastly on this idea of proportionality, you know,

19   this is a large case.  I mean, this is 20-plus years in

20   custody.  No one is going to limit Mr. Loevy on the damage

21   request at trial, if we go to trial.  So the idea that 800

22   calls is a little bit more than maybe they think they can

23   handle or that they want to handle to me is -- no one is going

24   to be limiting him or their firm, and we shouldn't be limited

25   now, respectfully, beyond what we've talked about.

```
 1              THE COURT:  Anything from the county?

 2              MS. HUNTSMAN:  The county has no position, Judge.

 3              THE COURT:  Okay.

 4              MS. POOLE:  Your Honor, I did, if you don't mind.

 5              THE COURT:  I'm sorry.  Let me just give the others an

 6  opportunity.

 7              MS. POOLE:  Sure.

 8              THE COURT:  Sinson?

 9              MR. MICHALIK:  Defendant Sinson has no additional

10  arguments, Judge.  We align with the arguments made by

11  Ms. West.

12              THE COURT:  Okay.  I'm sorry.  Go ahead, Ms. Poole.

13              MS. POOLE:  No, I apologize.  I don't want to belabor

14  this point if the Court isn't particularly persuaded by it, but

15  I think the point that Mr. Masciopinto and Ms. West made about

16  damages discovery, I think the -- I don't think any of these

17  witnesses have yet been deposed.  Correct me if I'm wrong.  I

18  think their depositions are upcoming.  So you can ask those

19  folks at their depositions -- and I know they will -- about

20  what their discussions were with as to damages.  You can ask

21  Mr. Logan about his damages.  I don't think you need to listen

22  to the ins and outs of Mr. Logan saying, yeah, today was a

23  really bad day in prison in order to get that kind of

24  discovery.

25              THE COURT:  All right.  Thank you.
```

1        So with respect to the motion to quash, I'm going

2    to -- I am granting and denying it in part and also taking it

3    under advisement in part.  With respect to Tara Thompson, I do

4    want to do a little more digging before I actually rule on that

5    particular issue.  I think that the Seventh Circuit is quite

6    clear that you have to be -- that you have to be very strict in

7    terms of the elements to be satisfied for a communication to be

8    privileged, but I do understand it's a serious issue.  I do

9    want to take a look at more current decisions from the Seventh

10   Circuit before making a final call as to Ms. Thompson, so I'm

11   going to take that particular portion under advisement.

12       Regarding Bell Thomas, we only have two calls there,

13   and she is an alibi witnesses.  So the motion is denied as to

14   Bell Thomas.  So defendants are entitled to seek those two

15   calls.

16       Regarding Lasandra Smith, I'm not seeing a whole lot

17   there aside from perhaps social conversation about how things

18   are going and Mr. Logan asking how are the kids doing,

19   essentially.  Given the number of calls, 36, I will allow

20   defendants to select 15 calls.

21       Regarding Ezzie Logan, I'm going to go ahead and allow

22   defendants to select up to 50 calls.  The number of calls is

23   really an operation of the number of years that Mr. Logan spent

24   behind bars.  That's what it comes down to.  As somebody is

25   behind bars longer and longer, damages are much greater, but

1    also the calls are much higher.  So it's simply an operation of

2    how long somebody spent in time behind bars.

3            So in terms of Ezzie Logan, you know, again, the

4    reason why I'm not putting a time limit and I'm just simply

5    giving you the number of calls, I think it's fair to say that

6    most people are going to be more fluent about what happened and

7    what should have happened during the first two years of

8    incarceration or during certain legal proceedings that are

9    going on, so I'll let the defendants decide which calls to

10   secure in order to listen.

11           Regarding Earlene Logan, I will allow 200 calls to be

12   identified under the same idea here.  The idea that Mr. Logan

13   is somehow -- I don't know -- giving away his privacy, number

14   one, we're talking about conversations with family members.  I

15   don't know about you, but I'm really not that intimate with my

16   sister, my sister or my brother, when I'm sharing my thoughts.

17   I mean, usually it's about what's happening in our daily lives.

18           But I think it's fair to say that in these

19   circumstances Mr. Logan may certainly share his views on what's

20   going on behind bars.  Quite frankly, this information may be

21   very helpful to Mr. Logan.  It may be corroborating evidence to

22   show how crappy it was during the time that he was behind bars,

23   and he's just unloading to his family members.  But given that

24   there was an objection from plaintiff's side, we're only

25   limiting the calls to the ones identified by defendants.

1          So if the defendants have not identified a call to be

2    subpoenaed, then the other calls are not going to be coming

3    into evidence or be offered as evidence.  I just want to be

4    very clear about that.  So the calls that defendants seek and

5    subpoena are fair game in terms of who gets to use those calls.

6    So, you know, sometimes you don't -- I'll leave it to

7    defendants, you know.  If you really want to get these calls,

8    so be it, but those calls can be used by both sides.

9          I haven't had a 1983 case where these types of calls

10   were, in fact, used as evidence, so I'm not sure how probative

11   these calls are, but certainly there is relevance.  In terms of

12   proportionality, not all the calls are going to be on point

13   about perhaps issues of liability or damages.  It's simply an

14   update from family members telling Mr. Logan what's going on.

15   That is also I think a fair presumption to make.

16         Did I cover everything?

17         MS. POOLE:  I think so, Your Honor.

18         THE COURT:  Ms. Thomas, Ms. Logan, okay.  Just so

19   we're clear, Bell Thomas, we have two calls that can be

20   subpoenaed.  We have Earlene Logan, the sister, 200 calls that

21   can be subpoenaed.  So these are the ceiling.  So if you want

22   to subpoena less, that's totally up to you.  Then for Lasandra

23   Smith we have 15 calls to be subpoena, and Ezzie Logan 50 calls

24   to be subpoenaed.  You can go ahead and do that as quickly as

25   possible.

```
 1              With respect to Ms. Thompson, again, I hope to get
 2    something out by next week so that we don't slow down
 3    discovery, but I do want to double-check my reasoning because I
 4    know it can be very -- I mean, it's also a stand-alone issue
 5    that can be appealed to the district judge and then reserved
 6    for the Seventh Circuit.  I don't even know whether it can be
 7    appealed at that point because it's unfortunate that we can't
 8    really get a whole lot of direction from the Seventh Circuit on
 9    this issue.  But in any event, that's my plan.
10              Any questions, Ms. Poole?
11              MS. POOLE:  No.  Thank you very much, Your Honor.
12              THE COURT:  Any questions from defendants?
13              MS. WEST:  No, Your Honor.
14              THE COURT:  All right.  Thank you.
15      (Proceedings concluded at 1:35 p.m.)
16                        C E R T I F I C A T E
17        I certify that the foregoing is an accurate transcript
18    produced from an audio recording of proceedings in the
19    above-entitled matter.
20    /s/Patrick J. Mullen              August 24, 2025
      _____        _____
21    Patrick J. Mullen
      Retired Official Court Reporter
22
23
24
25
```